William J. BENSON, Plaintiff-Appellee,

v.

Robert H. ALLPHIN, et al.,
Defendants-Appellants.

No. 84–2186.

United States Court of Appeals,
Seventh Circuit.

Argued April 16, 1985.

Decided March 10, 1986.

As Amended on Denial of Rehearings
April 11, 1986.

See also 544 F.Supp. 464.

Andrew B. Spiegel, Chicago, Ill., for defendants-appellants.

Paul J. Petit, Betar & Petit, Chicago, Ill., for plaintiff-appellee.

Before BAUER, ESCHBACH, Circuit Judges, and PELL, Senior Circuit Judge.[*]

ESCHBACH, Circuit Judge.

The plaintiff, a former state employee, alleged in this § 1983 action (1) that the defendant state officials discharged him in retaliation for the exercise of his First Amendment rights and (2) that, after his discharge, the defendants conspired to harass him in violation of his First Amendment rights. The primary questions presented on appeal are (1) whether the district court erred in granting a directed verdict to one of the defendant state officials on the ground that the plaintiff failed to present sufficient evidence to implicate the official in the alleged post-termination conspiracy and (2) whether the district court erred in granting a judgment notwithstanding the verdict to another state official on the ground that the official was qualifiedly immune. For the reasons stated below, we will vacate the directed verdict, vacate the judgment notwithstanding the verdict in part, and remand for a new trial on the remaining claim.

I

This appeal presents another chapter in the dispute between the plaintiff, William Benson, and certain officials of the State of Illinois. An earlier decision of this court, *Benson v. Scott*, 734 F.2d 1181 (7th Cir.) (*"Benson I"*), cert. denied, — U.S. —, 105 S.Ct. 435, 83 L.Ed.2d 361 (1984), involved a related lawsuit filed against the former Illinois Attorney General and the former Illinois First Assistant Attorney General. In view of our disposition of this appeal, an extended discussion of the evidence presented at the fourteen-day trial is unnecessary. In addition, because the plaintiff is appealing from the district court's grant of a directed verdict for defendant Rummel and a judgment notwithstanding the verdict for defendant Allphin, we must review the evidence in the light most favorable to the plaintiff. *Cf. Mathews v. Fairman*, 779 F.2d 409, 415 (7th Cir.1985).

Considering the evidence in this manner, the following facts emerge: Benson was employed by the Illinois Department of Revenue ("DOR") from 1971 until his dismissal in 1976. On November 1, 1974, Benson entered into a one-year written contract with the DOR to "undertake projects requiring personal and technical services as assigned by the [DOR] concerning pending investigations for the [DOR]." The contract was terminable at will by either party upon written notice. The parties entered into a similar contract that commenced November 1, 1975, and expired on June 30, 1976. Benson was terminated on June 24, 1976, six days before the second contract was to expire of its own accord.

Benson was initially assigned to assist in the enforcement of the Illinois Cigarette Tax Act, codified at Ill.Rev.Stat. ch. 120, ¶¶ 453.1 to .22 (1975) and the Illinois Cigarette Use Tax Act, codified at *id.*, ¶¶ 453.31 to .51 (referred to collectively as "Tax Act" or "Act")[1] at the Illinois-Indiana border.[2] Benson lived in South Holland, Illinois, which is not far from the Indiana border, and worked out of a squad room on LaSalle Street in Chicago.

---

[*] Judge Pell heard oral argument and participated in the voting conference immediately following oral argument, but terminated his participation in this case on December 31, 1985.

**1.** Both acts have now been consolidated as the Illinois Cigarette Use Tax Act, codified at Ill. Rev.Stat. ch. 120, ¶¶ 453.1 to .67 (1984).

**2.** Benson was also involved in the enforcement of laws relating to retailer occupation taxes, motor fuel oil taxes, as well as bingo and lottery activities.

In the latter part of 1971, the DOR placed certain cigarette stands in Indiana under surveillance where it could observe individuals purchasing cigarettes and then transporting them into Illinois without paying the appropriate tax. After assuming the position of Director of the DOR in the latter part of March 1973, defendant Robert Allphin adopted a policy of arresting Tax Act violators and confiscating their vehicles. Benson and his partner, James Kelleher, were involved in the enforcement of this policy. Benson made numerous arrests. He also took photographs of individuals allegedly violating the Tax Act. These photographs were said to include pictures of Chicago police officers, Chicago firemen, and other state, county, and city employees engaged in violations of the Act. Benson retained the negatives of these photographs.

Benson maintained that, from 1974 until the time of his termination, he was ordered not to enforce the Tax Act against state, county, and city employees, especially Chicago police officers. He discussed this matter extensively with his supervisors and co-workers. In addition, Benson informed his supervisors and co-workers that he had taken photographs of Tax Act violations and that he had retained the negatives.

Benson also criticized the DOR's tax-collection policy, and maintained that collection suits were being settled for unacceptably low amounts.[3] Apparently only Allphin and defendant Rummel (the Associate Director of the DOR) were authorized to settle these suits. Benson maintained further that certain taxpayers were making payoffs to DOR personnel in order to escape prosecution.

After Benson discussed his grievances with Allphin and Rummel in the latter part of 1975 and the early part of 1976, his duties at the DOR were changed, in that he was ostensibly assigned in January 1976 to a continuing investigation into the improprieties he had alleged were taking place within the DOR. Allphin and Rummel also told Benson to report only to them, and not to come to the DOR office in Chicago.

Allphin and Rummel instructed Benson not to reveal any investigatory information to the public. However, because he was dissatisfied with the manner in which his superiors were handling the investigation, Benson discussed his allegations with reporters from the *Chicago Tribune* and *Hammond Times* in February or March of 1976. Benson also turned over some of his photographs to a reporter in June 1976. As a result of these disclosures, several stories regarding Benson's allegations appeared in the press in March 1976; another series was published in August 1976 after Benson was terminated.

After Benson made these disclosures to the press, Allphin and Rummel tried to keep a tighter rein on him. He was again told not to discuss these matters with anyone outside the DOR. Several meetings were arranged, however, between Benson (along with other DOR personnel) and the Internal Affairs Division of the Chicago Police Department in the spring of 1976. At these meetings, Benson was allowed to discuss the alleged selective enforcement problem and his surveillance photographs. Despite these meetings, Benson still believed that the DOR was not acting in good faith and that his superiors were attempting to cover up the allegations. In early June 1976, he indicated to DOR personnel that he might make further disclosures of his allegations to the public and press. Allphin and Rummel decided that Benson's services were no longer needed, and terminated him on June 24, 1976.

During this same period, Benson and other DOR personnel had become embroiled in federal litigation challenging the DOR's enforcement of the Tax Act. Benson was named as a defendant in several of these civil-rights actions. In addition, an Illinois state trial court in April 1974 had enjoined the enforcement of the Act at the Illinois-Indiana border against persons who purchased cigarettes for their personal consumption and not for resale. The DOR,

---

3. It should be noted that Benson was not in-

volved in the collection of the disputed taxes.

nonetheless, continued its enforcement activities, and as a result was held in contempt in December 1975 by the Illinois state trial court. Benson had testified on behalf of the DOR at the 1975 contempt proceedings. On July 21, 1976, after he had been terminated, Benson filed an affidavit with the state trial-court judge. In the affidavit, he stated that he had been told by his superiors at the DOR to disregard the April 1974 injunction and to distort his testimony at the contempt hearing. Benson claimed further that DOR records had been destroyed and that others had been withheld or altered in violation of the state court's production order. He also discussed the alleged selective enforcement problem.

The Illinois Attorney General sent a letter to Allphin, dated September 2, 1976, which indicated that the State of Illinois, because of conflicts of interest, was withdrawing its representation of the DOR defendants, including Benson, in eight civil-rights suits pending in federal district courts. Allphin and Rummel decided to provide representation at the Department's expense to all DOR defendants except Benson. In addition to withdrawing legal representation for Benson, Allphin and Rummel maintained a campaign of harassment against their former employee. For example, they caused information to be sent to the Social Security Administration and the Internal Revenue Service to encourage investigations of Benson. The reason for these adverse actions against Benson was Allphin and Rummel's dissatisfaction with Benson's disclosures within the DOR, to the press, and to the judiciary.

Benson filed this § 1983 action against Director Allphin and Associate Director Rummel in October 1977. Count I of the amended complaint alleged that, after Benson's termination, Allphin and Rummel conspired to harass him in retaliation for exercising his free-speech rights. Count II alleged that Benson was in fact terminated from his position at the DOR in retaliation for exercising his free-speech rights. The case finally came to trial in October 1983. The court dismissed Rummel as a defendant pursuant to his directed-verdict motion filed at the close of Benson's case-in-chief. At the close of the trial, the jury found in favor of Benson and against Allphin on both counts. It awarded Benson $350,000 for the retaliatory discharge and $3,000 for the failure to provide legal representation after the discharge. Allphin filed motions for a judgment notwithstanding the verdict and for a new trial.

The trial court issued a somewhat ambiguous order in ruling on Allphin's post-trial motions. The court first found that, on the basis of the evidence presented, a reasonable jury could conclude that Benson was terminated in retaliation for his "attempted exercise of the right of free speech" and that Allphin's proffered business justification for the termination was a pretext. The court went on to conclude that, under the Supreme Court's decisions in *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) and *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), Allphin, as a high ranking government official performing discretionary functions, was entitled to qualified immunity from civil damages. The court found that Benson was exercising his free-speech rights primarily with reference to two matters: (1) the allegedly low settlements by the State of Illinois of large claims for delinquent sales or use taxes in contested cases brought and settled by Allphin and his legal advisors and (2) the refusal of Allphin to permit the arrest of Chicago police officers who were apparently buying cigarettes in Indiana and bringing them into Illinois without payment of the required tax. While the court acknowledged that these may be matters of public concern, it also found that their disclosure undermined Allphin's authority and control over his office.

With reference to the low settlements, the court found that Benson did not have an unqualified right to speak out on this matter and that Allphin's efforts to maintain confidentiality were required under Ill. Rev.Stat. ch. 120, ¶ 453.10b (1975). In the court's opinion, Allphin's interest in the

proper functioning of his office outweighed Benson's First Amendment interests in this regard.

With reference to the selective enforcement, the court noted that Allphin allowed Benson to bring the matter to the attention of the Chicago Police Department and that the DOR took steps to remedy the problem. With reference to the disputed photographs, the judge found that these were compiled as part of an investigatory file and that Benson was not privileged to disclose them to the press. The court also relied on ¶ 435.10b to support this conclusion. According to the court, Allphin acted in the best interests of the state by requiring that Benson go to the police department, rather than the press, with these allegations.

Thus, the trial court found that Allphin had imposed reasonable restrictions on Benson's expression and also added that (although the question was never presented to the jury) there was "no evidence in the record to support a jury finding that defendant as a reasonable person under all the circumstances would have known that his termination of plaintiff's contract would violate any clearly established constitutional right."

The court then held that damages could not be recovered in this case because they were barred by the Eleventh Amendment. Under Illinois law, because there was no evidence of willful or wanton conduct on the part of Allphin, the state would be required to indemnify him. *See* Ill.Rev. Stat., ch. 127, ¶ 1302. The trial court reasoned that this was in fact a recovery of damages from the sovereign, which the Eleventh Amendment prohibits.

In considering the alternative motion for a new trial, the court found that the damage award was excessive. The trial court

indicated that, but for the defendant's qualified immunity and the Eleventh Amendment's bar to recover, it would have set aside the verdicts and ordered a new trial, because the jury's decision appeared to be a product of passion and prejudice. In the court's opinion, a fair award would be $50,000 plus attorney's fees under 42 U.S.C. § 1988.[4] The court then vacated the jury's verdict and entered judgment in favor of the defendant as a matter of law. It then stated, "Alternatively, if both parties waive appeal, a consent judgment will be entered in favor of the plaintiff for $50,000 plus attorney's fees and costs." The parties, predictably enough, did not agree to such a waiver. This appeal followed.

## II

### A. *Motion for Judgment Notwithstanding the Verdict*

We will first consider a procedural point raised in the proceedings below. Prior to trial, the defendants filed motions for summary judgment in which they asserted a defense of qualified immunity. These motions were denied. At the close of the plaintiff's case, the defendants moved for a directed verdict on several grounds, one of which was the defense of qualified immunity. This defense was initially rejected.[5] Counsel for Allphin, the only remaining defendant at the close of the trial, also offered a jury instruction on qualified immunity, but this instruction was properly rejected by the trial court.

Counsel for Allphin, however, failed to move for a directed verdict at the close of all evidence. The jury retired to deliberate on Friday, October 28, 1983. On Monday, October 31, 1983, Allphin's counsel attempted to make a directed-verdict motion. The district court stated that it would take

---

4. The trial court's opinion does not clearly indicate whether it would order a new trial on both liability and damages, or damages alone. However, both sides have interpreted the court's order as calling for a new trial on both issues, and we agree. Thus the $50,000 award (especially in view of the court's rulings on immunity and the Eleventh Amendment) appears to be no

more than an indication of a reasonable settlement offer.

5. In response to the directed-verdict motion, however, the district court dismissed Rummel as a defendant on the ground that the plaintiff had not demonstrated that there had been a conspiracy.

the matter under advisement and "decide it after the case is finished as a post-trial motion." The court's next statement, however, was that the jury had reached a verdict on liability, but that they had not yet determined the amount of damages.

After the jury returned verdicts for the plaintiff, Allphin moved for judgment notwithstanding the verdict under Fed.R. Civ.P. 50(b) and, in the alternative, for a new trial under Fed.R.Civ.P. 59(a). In his Rule 50(b) motion, Allphin again asserted a defense of qualified immunity. The district court ultimately concluded that Allphin was immune and entered a verdict in his favor.

On appeal, the plaintiff argues that the defendant's failure to move for a directed verdict at the close of all the evidence constituted a waiver under Fed.R.Civ.P. 50(b) to seek a judgment notwithstanding the verdict.[6] We disagree.

Fed.R.Civ.P. 50(b) provides in relevant part:

> Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. ... [A] party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict.

Rule 50(b) is not a model of perspicuity. For example, the motion for a directed verdict mentioned in the second sentence above in fact refers to the motion described in the previous sentence. Thus, one learns from the notes of the Advisory Committee on the 1963 amendments to the rule that "[a] motion for judgment notwithstanding the verdict will not lie unless it was preceded by a motion for a directed verdict made at the close of all the evidence."[7]

There are two rationales for the requirement of a motion for directed verdict at the close of all the evidence as a predicate to a motion for judgment notwithstanding the verdict. The first has its roots in the constitutional right to a jury in a civil action. Judgment by directed verdict existed in 1789; judgment notwithstanding the verdict did not. Thus, a final judgment that is contrary to the jury's verdict might run afoul of the Seventh Amendment unless it is considered a reserved decision on an earlier motion for directed verdict.[8] *See McKinnon v. City of Berwyn,* 750 F.2d 1383, 1388 (7th Cir.1984); *Ohio-Sealy Mattress Manufacturing Co. v. Sealy, Inc.,* 585 F.2d 821, 825 (7th Cir.1978), *cert. denied,* 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979); 9 C. Wright & A. Miller, Federal Practice and Procedure § 2522 (1971). The second rationale involves pragmatic concerns: the motion for directed verdict at the close of all the evidence provides the nonmovant with an opportunity to do what he can to remedy the deficiencies in his case (by for example seeking to reopen his case-in-chief, altering his cross-examination of his opponent's wit-

---

**6.** We reject Allphin's argument that he was in "technical compliance" with Rule 50(b). It would stretch the notion of liberal construction of the Federal Rules beyond recognition to conclude that Allphin was in compliance with the letter of the rule when he offered a directed-verdict motion after the jury had initiated its deliberations and had reached an informal verdict on liability. The district court also recognized this, and stated that it would treat the motion for directed verdict as a post-trial motion. *Quinn v. Southwest Wood Products, Inc.,* 597 F.2d 1018 (5th Cir.1979), is not to the contrary, as the putative directed-verdict motion in that case was made before the jury had begun to deliberate. *Id.* at 1026.

**7.** A motion for directed verdict is not required as a predicate for a motion for a new trial.

**8.** The Seventh Amendment provides:
> In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law.

For a discussion of the current scope of the jury right under the Seventh Amendment, see *Complex Civil Litigation and the Seventh Amendment Right to a Jury Trial,* 51 U.Chi.L. Rev. 581, 606–13 (1984).

nesses, or offering further evidence in rebuttal to his opponent's case) before the jury retires to deliberate. *McKinnon,* 750 F.2d at 1388; *Ohio-Sealy,* 585 F.2d at 825.[9]

█ The text of Rule 50(b) admits of no exceptions. However, in response perhaps to the opacity of the rule and in an effort to base its decisions on substantive grounds, rather than procedural defaults, this circuit has allowed something less than a formal motion for directed verdict to preserve a party's right to move for judgment notwithstanding the verdict. *See, e.g., Johnson v. University of Wisconsin-Milwaukee,* 783 F.2d 59, 61 (7th Cir.1986); *Bonner v. Coughlin,* 657 F.2d 931 (7th Cir.1981); *Ohio-Sealy,* 585 F.2d at 825; *Pittsburgh-Des Moines Steel Co. v. Brookhaven Manor Water Co.,* 532 F.2d 572, 576–77 (7th Cir.1976). Unless Seventh Amendment questions are presented, the requirements of Rule 50(b) are not strictly enforced provided the prevailing party's failure to renew the motion for directed verdict did not unduly prejudice his opponent. *McKinnon,* 750 F.2d at 1389–90.

In the instant case, the Seventh Amendment considerations discussed above are of no moment, because the question of qualified immunity is addressed to the court, not the jury. *See Mitchell v. Forsyth,* —— U.S. ——, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *Harlow,* 457 U.S. at 818–19, 102 S.Ct. at 2738–39; *Bates v. Jean,* 745 F.2d 1146, 1151 (7th Cir.1984). Thus, a judgment notwithstanding the verdict on this ground in no way invades the province of the jury.[10]

As for the pragmatic considerations discussed above, Benson on appeal addressed the question of prejudice only in his reply brief to this court, where he points out that Allphin referred to the Illinois confidentiality statute, Ill.Rev.Stat. ch. 120, ¶ 453.10b (1975), for the first time in the post-trial briefs. Benson's first argument is that he was unduly prejudiced by this late reference, because he could have otherwise presented evidence to show that Allphin's reliance on the confidentiality statute was a pretext and that the statute did not apply to the materials released.[11] Benson does not, however, indicate what evidence he would have presented. His second argument is that the confidentiality statute is a defense and, therefore, that it should have been raised at the pleading stage.

We disagree with both contentions. First, the issue of qualified immunity is one for the trial court, not the jury. Thus, Benson could have attempted to present his evidence regarding pretext or applicability to the trial judge. He has not indicated that he attempted to do so. In addition, the defense of qualified immunity involves an objective, not subjective, standard to analyze the actions and knowledge of the defendant. *See Harlow,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396; *see also, Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). Thus, an inquiry into Allphin's actual state of mind is not appropriate under *Harlow;* the only question is whether his actions were objectively reasonable. In addition, as we understand

---

**9.** Two other reasons for the requirement of a directed-verdict motion prior to a motion for judgment notwithstanding the verdict were noted in *Quinn v. Southwest Wood Products, Inc.,* 597 F.2d 1018, 1024 (5th Cir.1979). First, a litigant should not be able to gamble on a jury verdict and later challenge the sufficiency of the evidence on appeal. Second, a litigant who has not moved for a directed verdict must consider the evidence sufficient to go to the jury, and should not then impute error to the trial judge for sharing that view. These concerns are not present in the instant case, because Allphin did attempt to move for a directed verdict challenging the sufficiency of the evidence before he could have known that the jury had reached a verdict.

**10.** It should be noted that the defense of qualified immunity is typically determined by motions under Fed.R.Civ.P. 12 or 56 and that these decisions on the immunity defense are immediately appealable. *See Mitchell v. Forsyth,* —— U.S. ——, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).

**11.** Counsel for Benson clarified this contention at oral argument, and stated that he would show that ¶ 453.10b did not cover *all* of the materials Benson released. This is, of course, an implicit concession that it did cover some of the materials.

Allphin's argument concerning ¶ 453.10b, he relies on this provision only as a declaration of the State of Illinois's interest in confidentiality. This statute is a part of the "state of the law" the court will consider in determining whether the defendant is entitled to immunity.

Second, Allphin's defense is qualified immunity, not ¶ 453.10b. While it would have been preferable for Allphin to have referred to the provision prior to the post-trial briefs, we do not understand how the late citation to ¶ 453.10b could have unduly prejudiced Benson when the trial court would in any event take judicial notice of statutory enactments [12] and when the defense at issue is one that was decided by the court on the basis of the post-trial submissions of both parties.[13]

To summarize, Allphins' failure to move for directed verdict at the close of all the evidence did not foreclose the presentation of a qualified-immunity defense in his motion for judgment notwithstanding the verdict.[14]

## B. *Qualified Immunity*

As government officials performing discretionary functions, Allphin and Rummel are shielded from liability for civil damages in a § 1983 action unless their conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738; *see also Davis*,

468 U.S. at —— n. 12, 104 S.Ct. at 3020 n. 12 (immunity standard of *Harlow* applies in § 1983 actions).

Although the Supreme Court has articulated the rule for qualified immunity, it has not fully explained what it means by the phrase "clearly established statutory or constitutional rights." First, it has not specified which court one must look to in determining whether a right is "clearly established," *see Harlow*, 457 U.S. at 818 n. 32, 102 S.Ct. at 2738 n. 32.[15] It seems obvious, however, that reliance on Supreme Court decisions alone might be inappropriate (unless they are the only cases ruling on the question), because they are infrequent in comparison to the decisions of the district and appellate courts, and this infrequency could have the practical effect of converting qualified immunity into absolute immunity.[16]

Second, although it has stated that government officials are not "charged with predicting the future course of constitutional law," *Pierson v. Ray*, 386 U.S. 547, 557, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288 (1967), the Court has not explained how close the factual correspondence must be between the actions under consideration and the decisions that establish the applicable law. Its decision in *Mitchell v. Forsyth*, —— U.S. ——, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), suggests, however, that officials are not required to anticipate the extension of existing legal principles.

---

**12.** *See McCormick on Evidence* § 335 (3d ed. 1984).

**13.** Benson's argument of prejudice is severely weakened by the fact that, after Allphin had mentioned ¶ 453.10b in his initial post-trial brief, Benson did not even discuss the provision in his brief in opposition.

**14.** As the discussion above indicates, however, Allphin is precluded from challenging the sufficiency of the evidence. In any event, Allphin has conceded that the evidence was sufficient to show that Benson was discharged for his expression.

**15.** A similar problem exists in other areas of the law. For example, the federal judiciary, when interpreting legislation, has at times relied on congressional "acquiescence" or "silence" in the face of previous judicial or administrative deci-

sions to devine the meaning of a provision. *See, e.g., Bob Jones University v. United States,* 461 U.S. 574, 599, 103 S.Ct. 2017, 2033, 76 L.Ed.2d 157 (1983). In order to make any sense, congressional silence must be considered an analogue to an "admission by silence." *See McCormick on Evidence* § 270 (3d ed. 1984) (discussion of admission by silence). Before a party's failure to speak may be used as an admission, it must be shown that the statement was "heard" by him. *Id.* In construing congressional silence, however, the courts have not indicated the level of the judicial or administrative process Congress is "listening" to.

**16.** Of course, if there is a conflict among the circuits, one must await the definitive resolution by the Supreme court.

These two considerations may not strongly influence the outcome of this appeal, however, because it would appear that there is one type of constitutional rule, namely that involving the balancing of competing interests, for which the standard may be clearly established, but its application is so fact dependent that the "law" can rarely be considered "clearly established." In determining due-process requirements for discharging a government employee, for example, the courts must carefully balance the competing interests of the employee and the employer in each case. Thus, the Supreme Court has consistently stated that one can only proceed on a case-by-case basis and that no all-encompassing procedure may be set forth to cover all situations. *See, e.g., Davis,* 468 U.S. at ——, 104 S.Ct. at 3018–19; *see also Benson I,* 734 F.2d at 1184–85. It would appear that, whenever a balancing of interests is required, the facts of the existing caselaw must closely correspond to the contested action before the defendant official is subject to liability under the *Harlow.*[17] With *Harlow's* elimination of the inquiry into the actual motivations of the official, *see* 457 U.S. at 815–19, 102 S.Ct. at 2736–39, qualified immunity typically casts a wide net to protect government officials from damage liability whenever balancing is required.[18]

In the instant appeal, *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and its progeny provide the standard by which Benson's First Amendment claims as a public employee must be analyzed. In *Pickering,* the Court stated that the problem was to arrive at a balance between the interests of the plaintiff, as a citizen, in commenting on matters of public concern and the interests of the state, as an employer, in promoting the efficiency of the public services it performs through its employees. *Id.* at 568, 88 S.Ct. at 1735; *see also Connick,* 461 U.S. at 140, 103 S.Ct. at 1686. The Court was at pains to point out that, in view of the "enormous variety of fact situations" in which critical statements by public employees may be thought by their superiors to furnish grounds for dismissal, it was not "appropriate or feasible to attempt to lay down a general standard" for resolving the free-speech claims of public employees and that it could only "indicate some of the general lines along which an analysis of the controlling interests should run." *Pickering,* 391 U.S. at 569, 88 S.Ct. at 1735. As the Supreme Court noted in *Connick,* 461 U.S. at 150, 103 S.Ct. at 1692, the particularized balancing required by *Pickering* is difficult even for the judiciary to accomplish. Therefore, while it may have been clear since 1968 that a citizen does not forfeit his First Amendment rights entirely when he becomes a public employee, the scope of those rights in any given factual situation has not been well defined. *Cf. Connick,* 461 U.S. at 150, 103 S.Ct. at 1692.

The specific question presented in this case is whether it was clearly established in the first part of 1976 that the actions of defendants Allphin and Rummel violated Benson's First Amendment rights.[19] Benson's expressions, for the

---

**17.** As noted in *Murray v. Gardner,* 741 F.2d 434, 440 n. 2 (D.C.Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1748, 84 L.Ed.2d 813 (1985):

Government officials must be granted the ability to pass unmolested through bogs of murky legal precedent. They must not become prey to every hypothesis of what the law might have come to forbid had it eventually developed along certain lines. When the law is clear, and·an official's duties delineated, then he will not be able to rely on the immunity defense. But we must not and do not demand that every government official become skilled in guessing the future path of the law.

*Cf. Davis v. Scherer,* 468 U.S. 183, —— n. 13, 104 S.Ct. 3012, 3021 n. 13, 82 L.Ed.2d 139 (1984).

**18.** There may, of course, be a situation in which the defendant's actions are so egregious that the result of the balancing test will be a foregone conclusion, even though prior caselaw may not address the specific facts at issue.

**19.** As noted above, *Harlow* eliminated the inquiry into the actual motivation of government officials. The Court, however, has not explained how this objective standard is to be employed when the plaintiff's claim depends on the state of mind of the defendant officials. *See, e.g., Estelle v. Gamble,* 429 U.S. 97, 104–05,

purposes of the *Pickering* balancing test, must be divided into three categories: (1) his discussions with his co-workers and supervisors within the DOR prior to his termination, (2) his disclosures to the press prior to his termination, and (3) his disclosures to the press and others after his termination.[20]

(1) As for Benson's in-house expressions prior to his termination, this court's decision in *Egger v. Phillips,* 710 F.2d 292 (7th Cir.) (en banc), *cert. denied,* 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983), is controlling. In *Egger,* we stated that, until the Supreme Court's 1979 decision in *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), it was an open question whether on-the-job expressions of public employees were entitled to constitutional protection. 710 F.2d at 315. A *fortiori,* constitutional protection for such expressions was not clearly established in 1976.

Allphin and Rummel are, therefore, entitled to immunity under *Harlow* for those claims relating to Benson's pre-termination, in-house expression.

(2) As for Benson's disclosures to the press prior to his termination, the answer is not as straightforward, but we ultimately conclude that the defendants are immune, because it was not clearly established in the first half of 1976 that discharging an employee in Benson's position violated the First Amendment. We note that *Pickering* provides protection to public employees who are speaking out on matters of public concern.[21] There is no serious dispute that Benson's charges of wrongdoing and corruption went beyond a personal dispute about internal DOR matters, and could qualify as matters of "public concern." However, even speech involving matters of public concern can legitimately lead to adverse employment action. *See Patkus v. Sangamon-Cass Consortium,* 769 F.2d

97 S.Ct. 285, 291–92, 50 L.Ed.2d 251 (1976) (violation of Eighth Amendment requires showing of deliberate indifference); *Washington v. Davis,* 426 U.S. 229, 238–41, 96 S.Ct. 2040, 2046–48, 48 L.Ed.2d 597 (1976) (Fourteenth Amendment requires showing of discriminatory intent). *Cf. Daniels v. Williams,* — U.S. —, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (state official's negligent act causing unintended loss of or injury to life, liberty, or property does not implicate Due Process Clause).

The state of mind of Allphin and Rummel is important in this appeal to the extent that it bears upon the causation requirement set forth in *Mt. Healthy City School District v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). At oral argument, however, the defendants conceded that the evidence was sufficient to show that their actions were primary motivated by Benson's expressions both inside and outside the DOR.

As previously noted, the issue of qualified immunity is typically resolved before trial. The question may be decided even after a trial, in which case objective factors are still the only legitimate focus of the inquiry. *See Bates v. Jean,* 745 F.2d 1146, 1152 (7th Cir.1984).

**20.** This third category relates to the claims of Count I. Allphin maintains that the denial of legal representation claim was dismissed from the case prior to trial. We disagree. The due-process claims relating to the denial of legal representation were dismissed, but not the First Amendment claims. In an order dated July 6, 1983, the trial judge to whom the case was

assigned stated that the issue of the denial of representation "may still be in the case as an alleged overt act of conspiracy."

There is still some confusion as to the status of these claims at the trial. In ruling on the defendants' motion for directed verdict at the close of the plaintiff's case, the district court seemed to retain the post-termination claims, but then directed Rummel out of the case because of insufficient proof of a conspiracy. However, the claim that Benson was denied representation in retaliation for his expression was submitted to the jury. Nonetheless, the district court made no specific reference to this claim in ruling on the post-trial motions. The court stated in its ruling that Allphin did not contest the jury award for Count I, when in fact the award was contested in Allphin's post-trial motions.

We do not need to resolve this confusion in view of our rulings that (1) the directed verdict for Rummel was improper and (2) a new trial must be conducted on the claim of Count I. In addition, in view of the Supreme Court's decision in *Mitchell v. Forsyth,* — U.S. —, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), we will determine whether the defense of qualified immunity is available to Allphin and Rummel for the post-termination activities. *See also Bates v. Jean,* 745 F.2d 1146, 1152 (7th Cir.1984).

**21.** The requirement that the expression be related to a matter of "public concern" was further developed in *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

1251, 1258 (7th Cir.1985). A court must consider the factors identified in the *Pickering* line of cases, *e.g.*, whether the expression would create problems in maintaining harmony among co-workers or discipline by immediate supervisors, whether the employment relationship is one for which personal loyalty and confidence are necessary, whether the expression could lead to controversy and conflict among officials, and whether the matter was one on which debate was vital to informed decisionmaking. *See, e.g., Patkus*, 769 F.2d at 1258. There are special concerns in the area of law enforcement that allow for greater restrictions on the expression of public employees. *See Zook v. Brown*, 748 F.2d 1161 (7th Cir.1984); *Jurgensen v. Fairfax County*, 745 F.2d 868 (4th Cir. 1984); *Benson I*, 734 F.2d 1181; *Egger*, 710 F.2d 292. It is also important to know whether the employee's position provides him with a special expertise on the matters at issue. *See Pickering*, 391 U.S. at 571–72, 88 S.Ct. at 1731. In addition, the presence or absence of rules, regulations, and statutes is important in striking the balance. *Cf. Connick*, 461 U.S. at 153 n. 14, 103 S.Ct. at 1693 n. 14; *Zook*, 748 F.2d 1161; *Jurgensen*, 745 F.2d 868; *Janusaitis v. Middlebury Volunteer Fire Department*, 607 F.2d 17 (2d Cir.1979); *Atcherson v. Siebenmann*, 605 F.2d 1058 (8th Cir. 1979).

The decisions cited above, many of which were decided *after* 1976, show that it was not clearly established in 1976 that it would be improper to attempt to keep the matters Benson was discussing within the DOR and the Chicago Police Department, and, therefore, to discharge him when he made disclosures to the press.[22] An accommodation of the factors listed above is difficult for the judiciary to accomplish in a consistent manner, *Egger*, 710 F.2d at 314; it blinks reality to expect the defendants to have accomplished this task more effectively than the courts in 1976.

The conclusion that the defendants' actions were objectively reasonable is strengthened by the confidentiality provision codified at Ill.Rev.Stat., ch. 120, ¶ 453.-10b (1975).[23] *Cf. Connick*, 461 U.S. at 153 n. 14, 103 S.Ct. at 1693 n. 14; *Zook*, 748 F.2d 1161. This statute does not conclusively determine the scope of the state's interest under the First Amendment;[24] it does, however, represent a declaration of the state's interest, and was binding on the plaintiff and the defendants. In view of the fact that the validity of ¶ 453.10b has never been challenged, it is difficult to see how the defendants could conclude that they were violating the clearly established First Amendment rights of the plaintiff in 1976 for what amounts to insubordination in violating state law.[25] *Cf. Jurgensen*, 745 F.2d 868 (violation of regulation constitutes insubordination); *Johnson v. Brelje*, 701 F.2d 1201, 1210 (7th Cir.1983) (no prior decisions on statute in question).

▇ (3) As for Benson's disclosures to the press and others after his termination, our decision in *Benson I*, 734 F.2d at 1185–86, compels the conclusion that Allphin and Rummel are not entitled to immunity. In the instant case, Benson claims that he was

---

**22.** In 1976, the primary Supreme Court cases that dealt with the First Amendment rights of public employees were *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). Both of these decisions identified, but did not extensively analyze, the employer's potential interest in confidentiality and in maintaining harmony among the employees.

**23.** In 1976, ¶ 453.10b stated in relevant part: All information received by the [DOR] from returns filed under this Act, or from any investigation conducted under this Act, shall be confidential, except for official purposes, and any person who divulges any such information in any manner, except in accordance with a proper judicial order or as otherwise provided by law, shall be guilty of a Class B misdemeanor.

**24.** *Cf. Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).

**25.** There are other confidentiality statutes that apply to DOR employees. *See, e.g.,* Ill.Rev.Stat., ch. 120, ¶¶ 453.50, 467.26, 478, 9–917 (1975). There are no reported court decisions in which the validity of these provisions has been placed into question.

denied legal representation as a result of his expression. It is true that Benson did not have a property interest (within the meaning of the Fourteenth Amendment) in those services. In *Benson I*, however, we concluded that, even if there is no right to a government benefit, the denial of that benefit may not be premised on an individual's exercise of his First Amendment rights. *Id.* at 1185. Furthermore, as noted in *Benson I*, the plaintiff was no longer in the employ of the DOR when he was denied legal representation. *Id.* at 1186. Thus, the interests of the state identified in *Pickering* that relate to efficiency drop out of the calculus for the most part. We conclude that, after *Benson I*, Allphin and Rummel are not immune to civil damages for those claims arising from their activities subsequent to Benson's termination.

We therefore affirm the district court's grant of judgment notwithstanding the verdict on the basis of qualified immunity for those activities of Allphin and Rummel that culminated in Benson's termination (i.e., Count II of the complaint). For those claims relating to the harassment of Benson after his termination (i.e., Count I), we find that the defendants are not immune.[26]

## C. *Directed Verdict for Rummel*

■ At the close of the plaintiff's case-in-chief, the district court granted a directed verdict for Rummel on the ground that Benson had not shown that Rummel was involved in a conspiracy to harass Benson after his termination. Benson argues that this ruling was error, and we agree. The standard for granting a directed verdict is very generous to the nonmovant. The trial court must view the evidence and make all inferences in the light most favorable to the nonmoving party, and if reasonable jurors could differ on the conclusions drawn therefrom, the case must go to the jury. *See Mathews v. Fairman*, 779 F.2d 409, 415 (7th Cir.1985). It is clear from our review of the record that the district court drew improper inferences in making this ruling. There was testimony presented up to that point in the trial that Rummel had been involved in the imbroglio at the DOR before and after Benson's termination and that both he and Allphin decided together not to provide legal representation to Benson after the Illinois Attorney General withdrew his representation in the civil-rights actions pending in federal district court.[27] We, therefore, vacate the grant of

26. Some of our cases decided prior to *Mitchell v. Forsyth*, —— U.S. ——, ——, 105 S.Ct. 2806, 2815–17, 86 L.Ed.2d 411 (1985), suggest that it is improper to dispose of a case solely on the ground that at the time of the alleged constitutional violation the right in question was not clearly established. Under these decisions, the court should conclusively determine whether a constitutional violation in fact occurred; otherwise, the status of such a right will be left "in limbo." *See Coleman v. Frantz*, 754 F.2d 719, 723 (7th Cir.1985). However, *Mitchell* calls for a reconsideration of this practice, because it suggests that, once the court has determined that the official is immune, it should not go on to decide the merits of the plaintiff's claim.

This judicial restraint is, of course, consistent with the "case and controversy" requirement of Article III. Once the defendant is found to be immune from damages in an action where only damages are sought, a resolution on the merits neither aids nor hinders the parties involved in the specific case, but simply provides guidance for future litigation. Many areas of the law are rife with uncertainty, but the judiciary may not act as a roving commission that decides impor-

tant questions when those questions are not properly presented in litigation.

The rationale given in the pre-*Mitchell* cases for reaching the merits was that the law would otherwise remain uncertain. Perhaps a parallel could be drawn to the "capable of repetition, yet evading review" exception to mootness. However, in the context of *Harlow*, this argument does not account for the fact that the question of qualified immunity arises when one files a *damage* action against an official in his individual capacity. The rights at issue will not necessarily "evade review," because they may be adjudicated, for example, in an action for declaratory or injunctive relief.

It is for these reasons that we express no opinion as to the merits of Benson's claims.

27. Allphin and Rummel contend on appeal that they cannot be held liable in the conspiracy alleged in Count I because Rummel was only providing legal advice to Allphin. Despite the defendants' claims to the contrary, our decision in *Lenard v. Argento*, 699 F.2d 874, 887 (7th Cir.1983), does not hold that, as a matter of law, government attorneys are immune from liability for conspiracy in a § 1983 action.

directed verdict for Rummel, and remand for a new trial on the post-termination conspiracy in which Rummel was allegedly involved.

### D. *Sovereign Immunity*

 As noted in Section I, *supra*, the district court held that any damage recovery was barred by the Eleventh Amendment because, under Ill.Rev.Stat., ch. 127, ¶ 1302, Allphin would be indemnified by the state. This ruling is incorrect. As this court recently noted in *Duckworth v. Franzen*, 780 F.2d 645, 650 (7th Cir.1985), which dealt specifically with ¶ 1302, "every court that has considered this issue has rejected, rightly in our view, the argument that an indemnity statute brings the Eleventh Amendment into play." Thus, that amendment does not bar recovery in this action.

### E. *New Trial*

The district court conditionally granted Allphin's motion for a new trial. We wholly concur in this ruling. The damages are not supported by the evidence, and the verdicts are clearly a product of passion and prejudice. *Cf. Ustrak v. Fairman*, 781 F.2d 573, 578–79 (7th Cir.1986). Only Count I of the complaint remains, however, and we will remand for a new trial on that count on the issues of both liability and damages.

### III

For the reasons stated above, we (1) AFFIRM the judgment notwithstanding the verdict for defendant Allphin on Count II on the ground that he is immune from civil damages and find that defendant Rummel is also immune under that count, (2) VACATE the judgment notwithstanding the verdict for Allphin and the directed verdict for

Rummel on Count I, and (3) REMAND for a new trial on Count I on the issues of both liability and damages. The parties shall bear their own costs on appeal.

---

We would, of course, be reluctant to hold that Rummel was liable if his sole role was the provision of legal advice in good faith. However, in this case the evidence strongly suggests that Rummel was acting as more than a legal advisor. In any event, the issue has not been properly presented on appeal, because Allphin and Rummel have not indicated to this court where they raised this issue below. *Cf. Graczyk v. United Steelworkers of America*, 763 F.2d 256, 261 n. 6 (7th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 335, 88 L.Ed.2d 319 (1985). We, therefore, express no opinion as to its resolution. Allphin and Rummel are free to pursue this issue on remand.