**Kay THOMPSON, Plaintiff,**

v.

**BOARD OF EDUCATION OF THE CITY OF CHICAGO, a body politic and corporate, Manford Byrd, Jr., General Superintendent of Schools, in his individual and official capacity, and Norman Silber, District Superintendent of District 31, in his individual and official capacity, Defendants.**

**No. 88 C 7637.**

United States District Court, N.D. Illinois, E.D.

March 21, 1989.

Harvey Grossman, Jane M. Whicher, The Roger Baldwin Foundation of the American Civil Liberties Union, Inc., Elpidio R. Villarreal, Theodore J. May, Marjorie S. Jacobson, Sonnenschein Carlin Nath & Rosenthal, Chicago, Ill., for plaintiff.

Patricia J. Whitten, Atty., Karen Gatsis Anderson, Edward J. Santiago, Miguel Angel Rodriquez, Board of Educ. of the City of Chicago, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ALESIA, District Judge.

The plaintiff, Kay Thompson ("Thompson"), has brought this action against the defendants, the Board of Education of the City of Chicago ("the Board"), Manford Byrd, Jr. ("Byrd"), and Norman Silber ("Silber"), pursuant to 42 U.S.C. § 1983. In her complaint, as amended, Thompson, a Chicago public school teacher and librarian, alleges that the defendants, while acting under color of state law, violated her right of free speech under the First and Fourteenth Amendments to the United States Constitution by transferring her to another school and by denying her "selected status" in retaliation for making remarks which were published in an article appearing in a weekly Chicago newspaper. As a result, Thompson seeks declaratory and injunctive relief, as well as damages.

On September 2, 1988, just prior to the opening of the new school year, Thompson applied to this Court for an order temporarily restraining and enjoining the defendants from transferring her to Carl Schurz High School, another Chicago public school, pending a hearing on, and resolution of,

her motion for a preliminary injunction. After hearing arguments of counsel, this Court granted Thompson's request and issued a temporary restraining order precluding the defendants from transferring Thompson. By agreement of the parties, the terms of the temporary restraining order have remained in effect to date.

This matter now comes before the Court for a final disposition on the merits following a five-day bench trial.[1] After hearing testimony, examining the credible evidence of record, and reviewing the applicable law, we issue Thompson a declaratory judgment and a permanent injunction. We also award her $15,000.00 in compensatory damages against defendant Board and $15,000.00 in compensatory damages against defendant Byrd, in his official capacity only. We set forth the facts as we find them to be and outline our reasons below.

## I. FACTS

Thompson is a teacher and librarian at Roberto Clemente Academy High School ("Clemente"), a public high school operated by the Board. Thompson has been employed by the Board as a librarian at Clemente since 1974, the school's first year of operation. She holds a Bachelor's Degree in History from Roosevelt University, a Master's Degree in Library Science from Rosary College, and a Master's Degree in Guidance and Counseling from Northeastern Illinois University. During her thirteen years at Clemente, Thompson has consistently received a "superior" rating, the highest rating available, on her employment evaluations. She has never been the subject of any administrative disciplinary proceeding.

The Board is a body politic and corporate charged by statute with operating the public schools of the City of Chicago. Byrd is the General Superintendent of the Chicago

public schools. In that capacity, Byrd makes the final decisions regarding personnel matters in all of the schools operated by the Board, subject to Board approval. Byrd's actions constitute the official practices and policies of the Board. Silber is the Superintendent of District 31, an administrative division of the Board. Clemente is located within the boundaries of District 31. As Superintendent of District 31, Silber has authority over personnel decisions within the district, subject to Byrd's approval. In this case, Thompson challenges two of the personnel decisions made by the defendants: the decision to involuntarily transfer her to Carl Schurz High School and the decision to deny her "selected status" at Clemente.

### Decision to Transfer Thompson

In October, 1987, in the wake of a Chicago teachers' strike, Elizabeth Blanchard, a journalist, contacted Thompson and two of her fellow teachers. Blanchard requested an interview with the three teachers in order to obtain their perspective on teaching conditions and the quality of education in an inner-city high school.[2] Thompson and her two fellow teachers consented to an interview and met with Blanchard on two subsequent occasions. The first interview occurred at Blanchard's home in Evanston. During that interview, the teachers discussed a variety of topics, including lack of administrative and Board support, lack of parental involvement at Clemente, low reading levels, high drop-out rates, and numerous other social problems perceived by them to affect student education within the Clemente community. The second interview occurred approximately three weeks later, after school had adjourned for the day, in Clemente's library. During this second interview, the teachers concentrated on the positive aspects of teaching and

---

**1.** This Court ordered the trial of this action on its merits to be advanced and consolidated with the hearing on the motion for a preliminary injunction pursuant to Fed.R.Civ.P. 65(a)(2) and the agreement of the parties.

**2.** Before Blanchard had ever contacted Thompson and her two fellow teachers for an interview, the Board had distributed a *Media Hand-*

*book for Principals,* which instructed its school principals as follows: "You cannot forbid a teacher or any staff member to speak to a reporter as long as the interview takes place during a period when the teacher or staff member is not on duty." That statement reflects current Board policy.

some of the success stories that had emanated from Clemente. Blanchard conducted both interviews in the form of an informal question and answer session.

After these interviews occurred, but before Blanchard submitted her finished product for publication, Blanchard showed Thompson a draft of the article she intended to submit. Thompson reviewed the draft, expressing her disappointment to Blanchard over the format and content of the draft. Specifically, Thompson noted that the draft did not appear in traditional article format, but, rather, read like a transcript. Additionally, Thompson pointed out that the draft painted a rather lopsided portrait of the matters addressed by the teachers because it omitted many of the success stories and positive aspects of teaching discussed by the three teachers during their second interview with Blanchard. Although Blanchard listened to Thompson's comments on the draft, Blanchard did not afford Thompson the opportunity to modify the draft.

Edited portions of the teachers' interviews appeared in the January 22, 1988 issue of the *Reader*, a weekly Chicago newspaper, under the caption "What's It Like To Teach In An Inner-City High School? Listen In: Three Teachers Talking" ("the *Reader* article"). The *Reader* article summarized the comments of the teachers, including Thompson, on a variety of topics related to the general conditions in the Chicago public schools and the conditions at one particular high school in a largely Hispanic area. The topics covered in the *Reader* article included teacher "burnout," lack of administrative and Board support, teen pregnancy, AIDS, gangs, high drop-out rates, low reading levels, lack of parental support and involvement, shortcomings of the bilingual program, incest, drugs, student attitudes, and other social problems perceived within the community. The article also briefly mentioned a few of the "success stories" and some of the positive aspects of teaching.

When it was published, the *Reader* article did not identify any of the three teachers by name, nor did it identify Clemente as the high school at which they taught. Instead, the *Reader* article described the positions held by each of the three teachers and assigned each of them a pseudonym. Thompson's pseudonym was "Meg," who was described as a 50-year old librarian.

Despite the use of this pseudonym, shortly after publication and distribution of the *Reader* article, certain individuals either affiliated with Clemente or residing in the surrounding community surmised that Thompson was "Meg" and that the high school described in the article was Clemente. As circulation of the article increased, certain comments made by the three teachers in the *Reader* article aroused the wrath of a small, but very vocal, band of individuals within the community. This small band of individuals expressed their outrage over certain comments in the article which they perceived to be insulting and offensive to the Hispanic community. Nevertheless, other members of the Clemente faculty and the Clemente community expressed their unequivocal support for Thompson.

During the next two months, in March and April of 1988, at least two faculty meetings and three community meetings were held, at which the contents of the *Reader* article were discussed. During the two faculty meetings, those teachers present expressed divergent views about the *Reader* article. Some teachers expressed support for Thompson and her fellow teachers; others did not. Those who did not consisted primarily of a handful of teachers assigned to the Clemente bilingual education program, which had been the subject of some critical remarks in the *Reader* article.

Prior to the faculty meetings, this small group of teachers who took offense at the remarks in the *Reader* article had formed an organization they dubbed the "Ad Hoc Committee of Concerned Clemente Teachers." Some of the teachers who comprised this ad hoc committee also actively participated in the three community meetings at which the *Reader* article was discussed. They circulated copies of the *Reader* article within the Clemente community and re-

cruited community members to attend the meetings and to launch a campaign to demand removal of the three teachers.

All three of the community meetings were led by Mirta Ramirez, the vice-president and acting president of the Clemente local school improvement council, an advisory body. Two of the three community meetings were previously scheduled hearings on the school budget, at which the conversation among the attendees turned from the topics listed on the agenda to the topic of community sentiment over the *Reader* article. During the two budget hearings, the same core group of bilingual teachers, along with Ramirez, demanded the removal of Thompson and her fellow teachers. Although Silber listened to their demands, he did not promise to take any action to remove the three teachers during either of these two meetings.

During the time which elapsed between the second and third community meetings, Silber and two other administrators met individually with each of the three teachers. On April 18, 1988, without any advance notice to Thompson, Silber summoned her to a meeting. Aside from Silber and Thompson, Arthur Tarvardian, Silber's assistant, and Jesus Sosa, Clemente's principal, were present. During this meeting, Silber made several remarks to Thompson regarding her participation in the *Reader* article. First, Silber told Thompson that if he were a private employer, he could fire her. Then, Silber stated that he had the power to transfer Thompson to another school. Finally, Silber asked Thompson what she thought he should do about the situation and Thompson facetiously responded that he should give her a raise. At the conclusion of this meeting, Tarvardian asked to speak privately with Thompson. During this private conversation, Tarvardian essentially told Thompson that she could fight the situation and win. Thompson interpreted Tarvardian's remarks to mean that he did not agree with Silber and Sosa as to how the situation should be handled.

Several days later, on April 21, 1988, Silber, Tarvardian, and Sosa attended the third community meeting, which was held at the Trina Davila Center within the Clemente community. Ramirez had invited Silber to attend the meeting, threatening to hold a press conference in the event that he failed to attend. Ramirez, one of Thompson's most vocal opponents, acted as the moderator of the meeting. Angel Quinones, one of the members of the "Ad Hoc Committee of Concerned Clemente Teachers," served as the translator at the meeting. He "summarized" in Spanish the contents of the *Reader* article for those Spanish-speaking individuals who had not read it. The majority of those present at the meeting again demanded the immediate removal of the three teachers. In response, Silber advised the group that it was not within his jurisdiction to fire the teachers. Silber further stated that although he had the power to transfer the three teachers, he refused to do so in late April because he did not want to disrupt the remainder of the school year. Without consulting any of the three teachers or their fellow faculty members, or conducting any further investigation, however, Silber did promise the group that he would remove Thompson and the other two teachers from Clemente prior to the opening of the 1988–89 school year. Silber made this promise in exchange for the group's promise to refrain from picketing or boycotting and to allow the school year to end peacefully.

Silber did not inform Thompson of his decision to transfer her until June 14, 1988. On that date, Silber, Tarvardian, Thompson, her two fellow teachers, and Victor Gonzalez, the union field representative, met in Silber's office. Silber then advised Thompson that he intended to transfer her to Carl Schurz High School before the opening of the next academic year because he thought she had lost her effectiveness at Clemente. Unlike her two fellow teachers, Thompson was offered only one "choice": to transfer to Carl Schurz High School. Thompson regarded the transfer as a punitive measure.

Byrd and the Board subsequently ratified Silber's decision to transfer Thompson. As a result, within the following month, Thompson received a formal personnel ac-

tion notice dated August 10, 1988. That notice indicated that Thompson had been transferred to Carl Schurz High School, effective September 5, 1988.

Shortly after receiving the personnel action notice, Thompson filed this lawsuit. At her request, on September 2, 1988, this Court intervened and issued a temporary restraining order preventing the defendants from transferring her to Carl Schurz High School. During the period of time between the publication of the *Reader* article and the issuance of the temporary restraining order, no actual disruption occurred at Clemente. No student or faculty member ever refused to use the library as a result of Thompson's continued presence and Thompson continued to discharge her duties as efficiently as she always had done. Even after publication of the *Reader* article, Sosa rated Thompson "superior."

Several weeks after the issuance of the temporary restraining order, on September 21, 1988, the Board issued another personnel action notice to Thompson. This notice directed Thompson to disregard the previous staffing notice of August 10, 1988 because it "was sent in error."

### Decision To Deny Thompson "Selected Status"

Pursuant to the terms of a consent decree entered into between the Board and the Justice Department to foster systemwide desegregation, the Board has designated certain schools, including Clemente, as "academy" high schools.[3] When a school is designated as an "academy," all teachers at the school (except assistant principals and counselors) receive an "inter-

im" or temporary appointment. "Interim status," as contrasted with "selected status," provides a teacher with less protection from removal, replacement, or transfer from a particular school. A teacher remains on "interim status" unless he or she is "selected" to the staff by the principal of the academy.

The decision to "select" staff initially rests with the principal of the academy. A principal, however, may only recommend a candidate for "selection"; Byrd has the final authority over decisions to terminate "interim" appointments, subject to Board approval. In the event a principal decides to "select" staff for a particular position, he must advertise the position in the Chicago Public Schools Personnel Bulletin. Under Section 42–4 of the collective bargaining agreement between the Board and the Chicago Teachers Union, "selection" must be "on the basis of specific, articulated criteria which are published, and which relate to the requirements of the position, the academic and professional background and the other relevant experience of the applicants which relate to the requirements of the position." These specific criteria are commonly referred to as "preferences."[4]

On April 18, 1988, approximately three months after publication of the *Reader* article, Sosa advertised that he would be "selecting" staff for all three librarian positions at Clemente. The advertisement indicated that preference would be given to those applicants who had a Master's Degree, training or experience in individualized instruction, individual and group-diagnostic evaluation and computer-assisted instruction, and a bilingual endorsement in

---

**3.** The parties entered into this consent decree in order to achieve voluntary desegregation in "racially identifiable" schools throughout the City. "Racially identifiable" schools are defined as those schools which will continue to have a disproportionately large population of one particular race despite any practicable form of student assignment program. To accomplish this goal of voluntary desegregation, the parties agreed to implement a program whereby certain schools, like Clemente, would receive additional funding and provide enriched educational opportunities in order to lure students of all races from across the city to enroll voluntarily. In keeping with this philosophy, the parties also

agreed that the faculty at these "academies" should be racially integrated and "selected" to fit particular needs. As a consequence, once the Board designates a high school as an "academy," all teachers staffed to that high school automatically receive an "interim" appointment and may apply for "selection" as positions are advertised.

**4.** The significance of a "preference" is that if two candidates apply for a position, all other qualifications being equal, the candidate who satisfies the "preference" will prevail.

Spanish.[5] In addition, the terms of the collective bargaining agreement required Sosa to accord preference to incumbents when choosing between two equally qualified candidates.

Thompson applied for one of the three "selected" positions, as did others. After receiving the applications, Sosa decided to interview six candidates. The candidates included all three of Clemente's incumbent librarians: Anne Markey, the head librarian, John Yonkoff, an assistant librarian, and Thompson. The remaining three candidates held librarian positions at other Chicago public schools.

Sosa conducted interviews in May and June of 1988. For each incumbent candidate, the interview panel consisted of Sosa, one of his four assistant principals (on a rotating basis), and Ramirez, if she chose to participate. For each of the outside candidates, the composition of the panel remained unchanged, except for the addition of Markey, the head librarian. At the conclusion of each interview, each interviewer typically evaluated the candidate using an "Interview Record Sheet," which specified twelve different criteria on which the candidate would be judged. If completed in its entirety, for each criterion, the candidate received a numerical rating on a scale from 1 (the highest) to 5 (the lowest). Each interviewer then added the numerical ratings given and computed a composite score.

Thompson interviewed for the "selected" position on May 18, 1988. Her interview panel consisted of Sosa, Marge Ackerman, one of Sosa's assistant principals, and Ramirez, one of Thompson's most outspoken critics. Thompson's interview lasted less than five minutes. At the conclusion of Thompson's interview, Sosa and Ackerman evaluated Thompson by completing their respective "Interview Record Sheets." Ramirez, however, failed to complete her "Interview Record Sheet," merely writing at the bottom "no comment." In addition, though Ramirez customarily made oral comments after each interview, she declined to do so after Thompson's interview.

By the time Thompson's interview was held, Silber had already promised Ramirez and other vocal opponents of Thompson that he would transfer Thompson from Clemente prior to the opening of the next school year. Sosa had concurred in Silber's decision.

Of the six candidates interviewed by Sosa, only Markey and Thompson had received a "superior" rating on their most recent employment evaluations. Markey and Thompson had similar library training and experience, though Thompson held two Master's Degrees (as compared to Markey's one) and Thompson's computer skills surpassed Markey's computer skills. None of the six candidates, including Markey, had a bilingual endorsement in Spanish. Although Markey received "selected status," Thompson did not. In a memorandum dated June 23, 1988, Sosa formally notified Thompson of his recommendation to retain her on "interim status" at Clemente. Shortly thereafter, Byrd and the Board expressly ratified Sosa's recommendation to deny Thompson "selected status." Thompson claims that both of these personnel decisions violated her First Amendment rights.

## II. FIRST AMENDMENT ANALYSIS

In deciding whether a public employee's First Amendment rights have been abridged by her employer, a three-step analysis is required. *See Mt. Healthy Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Knapp v. Whitaker*, 757 F.2d 827, 845 (7th Cir.), *cert. denied*, 474 U.S. 803, 106 S.Ct. 36, 88 L.Ed.2d 29 (1985). The court must determine: (1) whether, as a threshold matter, the public employee has carried her burden of showing that she engaged in constitutionally protected activity; (2) if so, whether the protected activity was a substantial or motivating factor in the employer's actions; and (3) whether the employer

---

**5.** A bilingual endorsement in Spanish requires a teacher to be certified to teach a given subject or specialty in both the English and Spanish languages. Before receiving such certification, the teacher must pass an examination.

has defeated the public employee's claim by demonstrating that it would have taken the same action in the absence of the protected conduct. *See Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. We examine each of these requirements in turn.

### A. Constitutionally Protected Activity

In *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the Supreme Court established a two-pronged balancing test to be used in determining whether a public school teacher's First Amendment rights have been violated. First, the court must decide whether the teacher's speech addressed "matters of public concern." *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734. If so, then the court must "arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734.

#### 1. *"Matters of Public Concern"*

■ Whether an employee's speech involves "matters of public concern" must be determined by "the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers,* 461 U.S. 138, 147–48, 103 S.Ct. 1684, 1690–91, 75 L.Ed.2d 708 (1983). For purposes of making this determination, the "inappropriate or controversial character of a statement is irrelevant." *Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 2898, 97 L.Ed.2d 315 (1987). Indeed, discussion on matters of public concern may " 'well include vehement, caustic, and sometimes unpleasantly sharp attacks ...' " *Rankin,* 483 U.S. at ——, 107 S.Ct. at 2898 (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964)). Thus, the mere fact that some listeners may take umbrage at certain remarks does not remove them from the realm of "public concern."

Applying these standards to this case, the remarks made by Thompson certainly fall under the rubric of "public concern." The content of Thompson's remarks encompassed a wide variety of topics at the forefront of contemporary public debate: the quality of education in public schools; the teaching and learning conditions in public schools; the ramifications of certain social, economic, and environmental factors on the educational process; and the numerous problems that plague the educational system. Relayed to the public in the form of a featured news article, Thompson's remarks presented the issues from a teacher's perspective. Publication of the remarks followed a bitter teachers' strike in this city and coincided with an ongoing debate throughout this city and the country over education of the young. Our consideration of the content, form, and context of Thompson's remarks leads us inescapably to the conclusion that they addressed matters of vital public concern.

The record abounds with evidence supporting this conclusion. First, Byrd and Sosa, both school administrators, conceded that the quality of education and conditions in the Chicago public schools constitute matters of vital public concern.[6] Aside from these admissions, Thompson presented the testimony of Michael Lenehan, a writer and managing editor of the *Reader* with substantial editorial and media experience. Lenehan testified that the *Reader* article contributed to the "ongoing debate" over the public education crisis not only in Chicago, but throughout the nation. He confirmed that because of the public significance of these matters, the *Reader* itself frequently published articles regarding education in public schools at the rate of two to three major feature articles per year and three to four smaller articles per year. Lenehan also commented on the particular pertinence of Thompson's remarks against the backdrop of the teachers' strike which immediately preceded her interview. According to Lenehan's testimony, this backdrop, together with the appeal of relating the issues directly from a teacher's per-

---

**6.** This stance, of course, stands in marked contrast to the pronounced stance of defendants' counsel, who refused to stipulate that these topics constituted matters of vital public concern.

spective, prompted Lenehan to accept the article for publication.

Finally, Thompson produced a number of publications of national and local stature, including *Newsweek, New Expression, The Chicago Tribune,* and *Chicago Times Magazine.* Like the *Reader* article, most of these publications lament the many weaknesses of the Chicago public school system; they do not portray the schools in a positive or flattering light. The *Newsweek* article, entitled "A School System Near Meltdown," describes a "bloated bureaucracy," "a powerful union," and numerous "wretched social ills" (limited English proficiency, poverty, high drop-out rates, and low teachers' salaries). *The Chicago Tribune* booklet labels Chicago's public schools the "worst in America."

Of particular note among these publications, however, is the final one, the *Chicago Times Magazine* article. Entitled "Bad Boys," this article, in a format virtually identical to that of the *Reader* article, summarizes the comments of five individuals on gangs, drugs, and violence among Chicago's youth, topics also covered in the *Reader* article. Ironically, Sosa, Clemente's principal, is one of the five individuals. His participation in the article, though it covered topics which can be characterized as distasteful and unpleasant, and it included remarks which some might deem derogatory or offensive, certainly demonstrates that he believed that the level of public concern on these issues warranted comment.

So did Thompson. This is not a case where Thompson sought to air a personal grievance in a public forum. *Cf. Connick,* 461 U.S. at 153–54, 103 S.Ct. at 1693–94 (public employee's circulation of questionnaire "followed upon the heels" of transfer notice); *Hesse v. Bd. of Educ.,* 848 F.2d 748, 751 (7th Cir.1988), *cert. denied,* — U.S. ——, 109 S.Ct. 1128, 103 L.Ed.2d 190 (1989) (all but one of public high school teacher's memoranda dealt with "matters of personal interest"); *Linhart v. Glatfelter,* 771 F.2d 1004, 1010 (7th Cir.1985) (public employee's thoughts regarding another public employee's job performance were ad-

mittedly his "own personal opinion and concern"). On the contrary, Thompson testified that she spoke out as a concerned teacher and citizen motivated by a genuine desire to alert the public to the crisis in the Chicago public schools. Frankly, we do not see how anyone could contest that the remarks in the *Reader* article constitute a legitimate topic of vital public concern.

### 2. The Pickering Balancing Test

In *Pickering,* the Court held that the Board of Education's dismissal of a high school teacher for openly criticizing the Board's allocation of school funds violated the teacher's First Amendment rights. *Pickering,* 391 U.S. at 574, 88 S.Ct. at 1737. The Court in *Pickering* recognized, however, that a public employee's First Amendment rights are not absolute; a balance must be struck. *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734. Since *Pickering* was decided, the Supreme Court has reaffirmed the need to balance the competing interests of the public employee and the public employer in the First Amendment context. *See Connick,* 461 U.S. at 142, 103 S.Ct. at 1687; *Rankin,* 483 U.S. at ——, 107 S.Ct. at 2896. In *Rankin,* the Supreme Court recently noted that "[t]his balancing is necessary in order to accommodate the dual role of the public employer as a provider of public services and as a government entity operating under the constraints of the First Amendment." *Rankin,* 483 U.S. at ——, 107 S.Ct. at 2896.

Although the Supreme Court has declined to formulate a precise equation for balancing these competing interests, it has offered some general factors for consideration:

(a) whether the speech impaired discipline by superiors or harmony among co-workers;

(b) whether the speech had a detrimental impact on close working relationships for which personal loyalty and confidence are necessary;

(c) whether the speech impeded the performance of the speaker's duties; and

(d) whether the speech interfered with the regular operation of the enterprise;

*Rankin*, 483 U.S. at ——, 107 S.Ct. at 2899 (citing *Pickering*, 391 U.S. at 570–73, 88 S.Ct. at 1735–37). These factors primarily focus on the "effective functioning of the public employer's enterprise." *Rankin*, 483 U.S. at ——, 107 S.Ct. at 2899. Our examination of the credible evidence of record reveals that the scales tip decidedly in favor of Thompson on all four factors.

### a. Discipline and Harmony

By all accounts, Thompson complied with the Board's policy requiring interviews to take place "after hours"; therefore, we cannot see how her participation in the *Reader* article could have undermined discipline at Clemente. Based on our review of the evidence, no school official ever testified that Thompson's remarks affected the disciplinary process at Clemente.

With respect to harmony among the Clemente faculty, we acknowledge that a handful of mostly bilingual faculty members, including Quinones, complained to Sosa about Thompson's remarks. According to Sosa's testimony, however, those expressing disagreement with Thompson's remarks numbered only five or six. At a public high school the size of Clemente, disagreement or negative sentiments expressed by five or six teachers, out of a teaching faculty of approximately 170, and a total staff of approximately 240 (Sosa's figures), do not rise to a level which could justify a finding of "impaired harmony among co-workers." We are not persuaded that the disagreement, or even outrage, of such a relative few would ever outweigh a fellow faculty member's right to speak out on matters of public concern.

### b. Close Working Relationships

Anne Markey, the head librarian at Clemente and Thompson's immediate supervisor, testified that the publication of the *Reader* article did not alter Thompson's close working relationships with Markey, other Clemente faculty members, or Clemente students in any way. Markey described Thompson's working relationship with Clemente students—both before and after publication of the *Reader* article—as "excellent." Similarly, Markey characterized Thompson's working relationship with her-self and other Clemente faculty members—both before and after publication of the *Reader* article—as "very good." Finally, Markey confirmed that no student or faculty member had ever refused to use the Clemente library as a result of Thompson's presence.

Neither Sosa nor any other school official disputed Markey's testimony, which was based on fifteen years of working side-by-side with Thompson on a daily basis. Even Quinones, the only Clemente faculty member who testified to being offended by the *Reader* article, admitted that during the course of performing his job he "almost never" had occasion to go to the library and "had very little reason" even to see Thompson during the day.

While Thompson's remarks may have detrimentally affected her personal relationships with Quinones and a few other fellow faculty members, we would expect that even under the best circumstances, most public high schools with large faculties function smoothly in spite of strained personal relationships and personality clashes among some faculty members. In any event, that is not an element that factors into our equation; here, our only concern is whether Thompson's speech detrimentally affected any of her close working relationships. As noted, the record is barren of any such evidence.

### c. Performance of Duties

Based upon her fifteen years of experience as Thompson's immediate supervisor on a day-to-day basis, Markey's assessment of Thompson's job performance was not only the most knowledgeable, but also the most reliable. Markey's testimony consisted of nothing but "kudos" and accolades for Thompson. Markey described Thompson as an "excellent librarian" and a "very gifted," "creative," and "enthusiastic", individual who took a genuine interest in students as people, as well as in their endeavors. While Markey candidly acknowledged that during her fifteen-year working relationship with Thompson, she had occasionally criticized Thompson, Markey essentially described those occasions as rare

and the reasons as trivial. Most significantly, Markey testified that the events which followed the publication of the *Reader* article in no way affected Thompson's performance of her job. Indeed, Markey unequivocally expressed her desire to maintain Thompson on the staff of Clemente's library because of her many valuable contributions.

Silber and Sosa agreed with Markey's assessment of Thompson as. an excellent and dedicated librarian. Yet, both of them also testified, without citing any specific reasons or examples, that they thought Thompson had "lost her effectiveness" after the publication of the *Reader* article. Neither of them, however, ever consulted Markey, who was certainly in the best position to know, or any other faculty member, to substantiate those general feelings.

Sosa's testimony on this issue was certainly suspect. If he truly believed that Thompson had lost her effectiveness after publication of the *Reader* article, his subsequent actions did not bear that out. Five months after the publication of the *Reader* article, Sosa gave Thompson a "superior" rating on her employment evaluation, a rating she had received for thirteen consecutive years at Clemente. While Sosa stated that he gave "superior" ratings "only to those who deserve them," he admitted on cross-examination that his actions in rating Thompson "superior" were not consistent with his feelings that she had lost her effectiveness. Frankly, we think Sosa's actions (in rating Thompson "superior") spoke louder than his words (his belated contention that he felt that Thompson had lost her effectiveness at Clemente).

Silber's testimony on this issue was equally suspect. Silber candidly admitted that his feelings along these same lines were predicated on discussions with Ramirez, one of Thompson's most outspoken critics, and "a few others," whom he could not name.[7] Like Sosa, Silber could cite no specific instances of deficient performance by Thompson.

For obvious reasons, on this issue, we credit Markey's testimony and discredit the testimony of Silber and Sosa to the extent that it conflicted with Markey's testimony. Thompson's unblemished employment record corroborated Markey's testimony. Accordingly, we specifically find that Thompson's remarks in the *Reader* article in no way impeded her job performance. This factor, then, also weighs overwhelmingly in favor of Thompson.

### d. Operation of the Enterprise

The defendants conceded that prior to the decision to transfer Thompson, there had been no actual disruption of the educational process at Clemente. Hence, at least up until the time Thompson was transferred, Clemente functioned as usual. Indeed, both Markey and Sosa verified that even to date, no student or faculty member has ever refused to use the Clemente library as a result of Thompson's continued presence.

Nevertheless, the defendants argued that their decision to transfer Thompson was justified based on the judgment of school administrators that there was "nascent disruption" or a "potential for disruption" at Clemente. However, neither the credible evidence adduced at trial, nor a proper analysis of the applicable law, supports the defendants' position.

We first examine the evidence elicited at trial to support the defendants' claims of "nascent" or "potential" disruption. In their trial brief, defendants contended that "[m]any parents, members of the community and other teachers perceived plaintiff's comments as racist and inflammatory." The defendants persisted in this theory at trial, presenting the testimony of Silber and Sosa, school administrators, who essentially confirmed that *some* individuals in the community had expressed outrage over the remarks contained in the *Reader* article. Silber and Sosa testified about three community meetings during which certain individuals had demanded removal of the three teachers. Sosa testified about

---

**7.** Silber was impeached on this testimony to the extent that he did not recall the "few others" until he testified at trial. In his deposition, Silber had apparently testified that his decisions were based solely on his conversations with Ramirez.

the two faculty meetings during which some faculty members criticized the three teachers.

Both school administrators appeared to place great emphasis on the final meeting held at the Trina Davila Center and led by Ramirez. Neither Silber nor Sosa had any idea who had been invited to attend this meeting or who had been excluded from it.[8] Moreover, among the three witnesses (Silber, Sosa, and Quinones) who testified about this meeting, there was not even a consensus as to approximately how many people attended the meeting. The estimates ranged from a low of 40 people (Sosa's estimate) to a high of 100 people (Silber's estimate) or 150 people (Quinones' estimate). Despite the fact that Silber's and Sosa's estimates as to the size of the crowd differed substantially, they both agreed that "a majority" of the people present demanded the removal of Thompson and her two fellow teachers. They also agreed that these individuals' repeated demands for removal of the three teachers and their threats to picket or boycott Clemente in the event these demands went unfulfilled formed the basis for the administration's conclusion that there was a "potential for disruption."

Significantly, when pressed to specifically identify those individuals at these meetings who repeatedly complained about Thompson's remarks and demanded her removal, Silber and Sosa consistently identified the same, small, basic, core group of individuals: a handful of faculty members from the bilingual program at Clemente and Ramirez. Apparently sensing this, Silber and Sosa attempted to magnify the significance of these individuals. In their testimony, Silber and Sosa both implied that Ramirez, who was vice-president and acting president of the local school improvement council, acted as a mouthpiece for other members of the community. If that were so (and we believe that credible evidence of record suggests that it was not so), the defendants never substantiated, nor even attempted to substantiate, that

Ramirez's views represented the views of others in the community, much less a consensus of community views. For the record, we note Ramirez's conspicuous absence at trial.

Of course, the conspicuous absence of testimony substantiating the defendants' claims was the hallmark of this trial. Of approximately 2,900 students currently attending Clemente, the defendants failed to present even one student to testify regarding this threatened disruption. Nor did the defendants present even one Clemente parent to provide similar testimony. Additionally, of approximately 170 members of the teaching faculty at Clemente and 240 total staff members at Clemente, defendants produced only one faculty member, Angel Quinones, to attest to this "nascent disruption."

Quinones, who holds a teaching certificate with a bilingual endorsement in Spanish, does not currently teach at Clemente, but serves as an attendance officer there. He resides in Des Plaines, a suburb of Chicago. His testimony consisted primarily of recounting his own emotional reaction to the remarks contained in the *Reader* article. He described feeling "deeply hurt, insulted, and outraged" after reading the *Reader* article. He characterized Thompson's comments in the *Reader* article as insensitive, mocking, and lacking in compassion. Nevertheless, Quinones admitted that at least some of the comments made in the *Reader* article were true.

Aside from testifying about his own thoughts and opinions on the *Reader* article, Quinones testified that he, another ex-Clemente faculty member (who, incidentally, now works for Silber), and a few other teachers (all except one from the bilingual program) formed the "Ad Hoc Committee of Concerned Clemente Teachers." According to Quinones, the individuals who formed this group did so to express their offense over the comments made in the *Reader* article. The members of this

---

8. Miguel DeJesus, a former Clemente student, testified that a teachers aide and two other faculty members from Clemente had initially denied him entrance to the meeting because he was perceived to be a supporter of the three teachers.

group may have expressed their offense, as they were perfectly entitled to do; yet, by Sosa's own admission, neither they nor any other staff members ever threatened to disrupt the educational process at Clemente. In addition, by Quinones' own admission, a substantial number of Clemente faculty members expressed their support for Thompson.

Finally, Quinones testified about his perception of the events at the Trina Davila community meeting. While his account of the meeting essentially corroborated Silber's account, Quinones availed himself of every opportunity to embellish and dramatize the extent to which those present at the meeting expressed hostile sentiments toward the three teachers. His entire demeanor betrayed his significantly biased perceptions, and his testimony weakened, rather than strengthened, the defendants' already tenuous claims of "nascent" or "potential" disruption.

The defendants presented no other testimony to lend support to their claims of "nascent" or "potential" disruption. Even Byrd, who, with the Board's approval, made the final decisions on transfer and "selection," testified that he never even spoke to Silber or Sosa about the situation, much less conducted an independent investigation of the matter. Instead, Byrd merely relied on secondhand information received from the Board's attorneys, who, in turn, received their information from Silber. Though empowered to appoint a crisis intervention team to investigate the situation, Byrd did not do so. This is telling evidence of the absence of any such disruption. We suspect that if the school administrators' fears of potential disruption were as strong then as they would have us believe now, those administrators would have applied pressure to have a crisis intervention team appointed. In sum, neither this nor the other testimony in the

record supports a finding of "nascent" or "potential" disruption.[9]

■ Even if it could, we do not believe that such a finding would justify the defendants' personnel decisions in this case. Seizing upon the language in *Connick*, the defendants asserted that they were not required to wait for "events to unfold" before taking action. *See Connick*, 461 U.S. at 152, 103 S.Ct. at 1692. The Court in *Connick* did indicate that when a public employee's speech merely "touches upon" a matter of public concern, it might not always be necessary "for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Connick*, 461 U.S. at 152, 103 S.Ct. at 1692. In the following sentence, however, the Court went on to say that "a stronger showing" would be required where, as here, the public employee's speech "more substantially involved" matters of public concern. *Connick*, 461 U.S. at 152, 103 S.Ct. at 1692. Following this directive, other courts have usually declined to find that a public employer's claims of "potential disruption" are sufficient to outweigh a public employee's right to speak out on matters of public concern. *See, e.g., Conner v. Reinhard*, 847 F.2d 384, 390–91 (7th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 147, 102 L.Ed.2d 118 (1988) (declining to do so where public employer failed to provide "any evidence of actual harmful effects" or where interference with public employee's duties was "de minimis or merely speculative"); *Zamboni v. Stamler*, 847 F.2d 73, 78 (3rd Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 245, 102 L.Ed.2d 233 (1988) (flatly rejecting the proposition that a finding of "potential" disruption could be sufficient to outweigh public employee's interests in speaking out on matters of significant public concern

9. That Sosa's remarks in the "Bad Boys" article, though equally derogatory in many respects, apparently did not provoke similar hostile sentiments within the community lends credence to the conclusion that the school administrators belatedly exaggerated the extent to which the sentiments of this small band of protesters represented sentiments of the better part of the

Clemente community. Lending further credence to this conclusion was the testimony of Michael DeJesus and Martin Montes. Both former Clemente students and residents of the community, they testified that all of the remarks made in the *Reader* article were true and they did not feel at all offended by them.

and, instead, holding that a showing of *actual* disruption is required).

The other cases cited by the defendants in support of their "potential disruption" argument are clearly inapposite. In *Jungels v. Pierce*, 825 F.2d 1127, 1132 (7th Cir.1987), the Seventh Circuit reversed the district court's order dismissing a public employee's First Amendment claim because of the absence of any evidence, much less a "substantial showing," of "disruption" based on hostile community sentiments. In *Raposa v. Meade School Dist.*, 790 F.2d 1349, 1355 (8th Cir.1986), the court upheld the transfer of a school teacher employed at a rural school attended by children from twelve families, where nine out of the twelve families persisted in demanding her removal. Thus, on its facts, *Raposa* is clearly distinguishable. Finally, in *Saye v. St. Vrain Valley School Dist.*, 785 F.2d 862 (10th Cir.1986), and *Gregory v. Durham County Board of Education*, 591 F.Supp. 145, 153 (M.D.N.C.1984), the speech at issue did not directly address matters of vital public concern, as Thompson's speech does here.

Accordingly, after weighing the competing interests of Thompson and the defendants in light of the applicable law, this Court concludes that the scales tip overwhelmingly in Thompson's favor. The defendants have failed to persuade us that their interests in quelling what they perceived to be "nascent" disruption in any way outweighed Thompson's interests as a teacher in speaking out on matters of significant public concern. Thus, we find that Thompson has indisputably carried her burden of establishing that she engaged in constitutionally protected activity.

### B. *"Substantial"* or *"Motivating"* Factor

■ Under the *Mt. Healthy* analysis, Thompson must also demonstrate that her speech was a "substantial" or "motivating" factor in the defendants' decisions to transfer her and to deny her "selected status." *See Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. at 576. The Seventh Circuit has recently clarified the scope of the public employee's burden on this issue:

The plaintiff's burden of establishing that the substantial or motivating factor was retaliation is a *burden of persuasion*, which he must prove by a preponderance of the evidence. The plaintiff's burden is not so facile that he can carry it by showing 'only that elimination of the protected activity may have been welcomed by the defendant or even that such activity played some minor role in the discharge decision.' Neither is it so burdensome that the plaintiff must show that the defendant's desire to inhibit protected conduct was the sole motive for his action. In fact, the plaintiff need not go as far as showing that 'a particular purpose was the "dominant" or "primary" one.' This court has stated that, in order to carry his or her burden, the plaintiff must show '*had it not been for the violation*, the injury of which he complains would not have occurred ....'

*Rakovich v. Wade*, 850 F.2d 1180, 1189–90 (7th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988) (citations omitted) (emphasis in original) (collecting other cases).

Thompson easily met this burden. Her unblemished employment record before and after the publication of the *Reader* article speaks for itself. No one disputed that Thompson was an excellent teacher and librarian. Thus, her professional competency never played a role in either the decision to transfer her or the decision to deny her "selected status."

#### 1. The Transfer

The record is replete with evidence suggesting that Thompson's transfer was punitive. First, the defendants essentially conceded that if Thompson had not participated in the *Reader* article, they would not have transferred her.

Second, Thompson testified that in her own experience, involuntary transfers were rare. The Board involuntarily transferred faculty members only when they engaged in bizarre behavior. The examples she cited—one teacher pulling a gun on another, or a teacher who purported to teach to an empty classroom—were illustrative.

Third, Thompson testified to Silber's remarks to her in their meeting of April 18, 1988 regarding her participation in the *Reader* article. Silber stated that if he were a private employer, he could fire her. He then followed up that remark by telling Thompson that he had the power to transfer her. These remarks, of course, followed publication of the *Reader* article and rumors that Silber intended to transfer her.

Fourth, Patricia Boland, an English teacher at Clemente and a union delegate, testified to Sosa's remarks at the faculty meeting on March 29, 1988. During that meeting, Sosa in substance stated that the three teachers had to "come forward, face the music, and get their punishment." In addition, Sosa told the teachers present that it was not good to speak to the press and to air their problems in public. This testimony was uncontroverted.

Finally, Silber himself admitted that in deciding which other schools within the district had vacancies which Thompson and her two fellow teachers might be able to fill, he eliminated from consideration a vacancy at Lane Technical High School for one of the other teachers who participated in the *Reader* article. According to his testimony, he did so because he feared that Ramirez and others would perceive the transfer as a "promotion," and he did not want that. All of this evidence pointed to defendants' punitive or retaliatory motive in transferring Thompson and satisfied Thompson's burden of persuasion on the transfer issue.

2. Denial of "Selected Status"

There was equally persuasive evidence in the record that Thompson's speech motivated Sosa to recommend denial of her application for "selected status." Sosa himself admitted that by the time he interviewed Thompson for the "selected" librarian position, both he and Ramirez had already decided that Thompson should be removed from Clemente. Sosa also admitted that Thompson's participation in the *Reader* ar-

ticle influenced him in making the recommendation to deny her "selected status." [10] Without more, this evidence satisfied Thompson's burden of persuading this Court that her speech was a "substantial" or "motivating" factor in the decision to deny her "selected status."

Thompson, however, also produced uncontroverted evidence that her interview for "selected status" occurred approximately three months after publication of the *Reader* article. Of the six candidates interviewed by Sosa, only she and Markey had received a "superior" rating on their most recent employment evaluations. Markey herself described her own qualifications and Thompson's qualifications as "very similar." Furthermore, Markey acknowledged that Thompson's computer skills surpassed Markey's computer skills. Although Markey and Thompson had substantially equal credentials and each of them satisfied all "preferences" except the "preference" for a bilingual endorsement in Spanish, Markey received "selected status" and Thompson did not. Of course, only Thompson had spoken to the press. This evidence, along with Sosa's admissions, forcefully suggested that Thompson's speech was a "substantial" or "motivating" factor in the decision to deny her "selected status."

C. *Defendants' Rebuttal*

Because Thompson has persuaded this Court that her speech was a "substantial" or "motivating" factor in both the defendants' decisions to transfer her and to deny her selected status, we must finally determine whether the defendants have defeated Thompson's claim by demonstrating that they would have transferred Thompson and would have denied her "selected status" even if she had not participated in the *Reader* article. *See Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. at 576. We examine the evidence offered by the defendants to rebut Thompson's claims that each of these

10. At trial, Sosa attempted to qualify this testimony by indicating that he was only influenced in small part by Thompson's speech. To the extent that Sosa attempted to retreat on this issue, he was impeached with testimony from

his deposition wherein he had remarked that he would have to have been a "human idiot" not to have been influenced by Thompson's participation in the *Reader* article.

decisions would have been made in any event.

### 1. The Transfer

The defendants contended that the "negative community reaction" to Thompson's speech, rather than the fact of the speech itself, prompted their decision to transfer her. For the reasons already outlined in great detail, however, we have concluded that this proffered reason was not only unworthy of belief, but also legally unacceptable. Defendants offered no other reason for transferring Thompson. There was none. While the defendants presented evidence that they *could* have transferred Thompson at any time as a result of her "interim status," they presented absolutely no evidence that they *would* have done so in the absence of the *Reader* article. Thus, the defendants have failed to show that they would have transferred Thompson in any event.

### 2. Denial of "Selected Status"

The defendants argued that they would have denied Thompson "selected status" apart from her participation in the *Reader* article for several reasons. First, the defendants asserted that a "superior" rating does not automatically confer "selected status," citing 8 out of 32 cases in which Sosa had recommended denial of "selected status" to faculty members with "superior" ratings. Further downplaying the significance of Thompson's "superior" rating, the defendants, through the testimony of Raymond Principe, Director of the Bureau of Teacher Personnel, presented Board statistics indicating that approximately 75% of Chicago public school teachers receive a "superior" rating. While we have no reason to dispute the Board's statistics, we also have no reason to believe that these statistics diminish the significance of Thompson's "superior" rating or render Thompson any less qualified; that the Board is blessed with many superior teachers does not somehow make Thompson less superior.

Second, the defendants pointed to Thompson's lack of a bilingual endorsement in Spanish, a "preference" clearly designated in the personnel bulletin which advertised the librarian positions open for "selection." This argument, however, quickly lost its surface appeal because neither Markey, who received "selected status," nor any of the candidates interviewed by Sosa, satisfied the "preference" for a bilingual endorsement in Spanish.

Finally, the defendants speciously argued that Thompson's scores on the "Interview Record Sheets," which were lower than Markey's scores, justified the defendants' decision to "select" Markey and not Thompson. Frankly, with all of the irregularities that attended Thompson's interview, the difference in scores is not terribly surprising. At that point in time, no one—not even Sosa—could deny that Thompson's interview panel, akin to a kangeroo court, viewed Thompson with a jaundiced eye. Even before Ramirez, one of Thompson's most outspoken critics, wrote "no comment" at the bottom of her "Interview Record Sheet" for Thompson, denial of "selected status" was a foregone conclusion. Indeed, the scores on these sheets do not bolster the defendant's rebuttal to defeat Thompson's claim. Instead, the scores on those sheets lend a great deal of credence to Thompson's claim that Sosa's recommendation to deny her "selected status"—a recommendation ratified by Byrd without even reading the *Reader* article, much less conducting any independent investigation—was significantly motivated by Thompson's remarks in the *Reader* article. Accordingly, we remain unpersuaded by any of the defendants' arguments that they would have decided to deny Thompson "selected status" had she not participated in the *Reader* article.

In sum, from all of the testimony elicited in this case, a clear picture emerged. A small, yet very vocal, band of individuals, led by Ramirez, Quinones, and a few other bilingual faculty members, did not like the comments made by the three teachers in the *Reader* article. In their view, the *Reader* article painted a negative view of their community. Instead of using these remarks as a catalyst for change, however, these individuals banded together, invited

others to jump on the bandwagon with them, and attempted to convert their displeasure into a *cause celebre*. They applied some pressure to school administrators to punish the three teachers for their comments by removing them. School administrators reacted by taking the spineless, yet politically expedient, course of action; that is, they capitulated to these demands. When called to task for encroaching on Thompson's First Amendment rights, these administrators justified their actions by belatedly crying "Henny Penny."

Today, we reaffirm that such conduct is intolerable under the First Amendment, and we refuse to give our imprimatur to the defendants' acts. We also make clear that the First Amendment cuts more than one way: just as it protects the rights of Thompson's opponents to criticize her, it also protects Thompson's right to speak out about problems which plague our community, our youth, and our schools. Perhaps Thompson's comments hurt and, even outraged, some individuals, but so do many comments which fall within the ambit of protected speech under the First Amendment. That is an unfortunate, but necessary, consequence of free speech.

## III. MUNICIPAL LIABILITY UNDER SECTION 1983

Citing the Supreme Court's recent decision in *City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988), the Board contends that as a municipality, it cannot be held liable under Section 1983. According to the Board, no cause of action lies against it under Section 1983 unless Thompson can prove that an unconstitutional municipal policy existed and that it was furthered by the actions of those who had final policymaking authority.

Thompson argues that the Board has overstated the reach of *Praprotnik*. We agree.

In *Praprotnik*, the Supreme Court attempted to answer some of the questions left unanswered by the Court in *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978), regarding the scope of municipal liability under Section 1983.[11] In *Monell*, the Court rejected the notion of *respondeat superior* liability under Section 1983, concluding that "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflict injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037. In arriving at this conclusion, the Court in *Monell* expressly indicated that it left the development of the "full contours" of municipal liability under Section 1983 for another day. *Monell*, 436 U.S. at 695, 98 S.Ct. at 2038.

In *Praprotnik*, the Court was faced with defining the proper legal standard for determining when *isolated* decisions by municipal officials or employees may expose the municipality itself to liability under 42 U.S.C. § 1983. The Court began by reiterating four of the guiding principles articulated by it earlier in *Pembauer v. Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986):

(1) municipalities may be held liable under Section 1983 only for " 'acts which [they have] officially sanctioned or ordered;' "

---

11. *Monell*, of course, unquestionably involved an official unconstitutional *policy*, as opposed to an official, though isolated, unconstitutional *decision*. Even after *Praprotnik*, however, we believe that the parameters of municipal liability for isolated decisions expressly ratified by the municipality or officials with the requisite policymaking authority remain somewhat nebulous. The inability of a majority of the Court to agree on any general formulation of the scope of

municipal liability in such a situation suggests that *Praprotnik* raises more questions than it answers. We agree with Justice Brennan's statement in his concurring opinion that the Court in *Praprotnik* "need not and therefore does not decide that a city can only be held liable under § 1983 where the plaintiff 'proves the existence of an unconstitutional municipal policy.' " *Praprotnik*, 485 U.S. at ——, 108 S.Ct. at 936 (Brennan, J., concurring).

(2) only those municipal officials who have "'final policymaking authority'" may, by their actions, subject a municipality to Section 1983 liability;

(3) whether a particular official has "'final policymaking authority'" is a question of *state law;*

(4) the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under the state law for making policy in *that area* of the city's business.

*Praprotnik,* 485 U.S. at ——, 108 S.Ct. at 924 (quoting *Pembauer,* 475 U.S. at 480, 106 S.Ct. at 1298) (emphasis in original).

Noting that the Courts of Appeals had already diverged in their interpretations of the *Pembauer* principles, the Court went on to refine the four *Pembauer* principles, paring them down to two principles. First, the Court reaffirmed that the issue of whether a given official possesses "final policymaking authority" is determined by reference to state law. *Praprotnik,* 485 U.S. at ——, 108 S.Ct. at 924. Second, the Court articulated the following standard of liability:

> [T]he authority to make municipal policy is necessarily the authority to make *final* policy.... *[W]hen a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies.* If the authorized policymakers approve a subordinate's decision and the basis for it, *their ratification would be chargeable to the municipality because their decision is final.*

*Praprotnik,* 485 U.S. at ——, 108 S.Ct. at 926 (emphasis supplied in part).

█ Applying these principles to this case, we first examine state law to determine which officials are charged with "final policymaking authority" to transfer personnel and to deny them "selected status" in the Chicago public schools. Our review of the Illinois School Code reveals that Byrd and the Board share "final policymaking authority" in these areas. Two provisions of the Illinois School Code verify their joint "final policymaking authority." First, Section 34–8 of the Illinois School Code provides in pertinent part: *"appointments, promotions and transfers of teachers,* principals, assistant and district superintendents and all other employees in the teaching force shall be made upon the *recommendation* of the general superintendent of schools *subject to the approval of the board."* Ill.Rev.Stat. ch. 122, ¶ 34–8 (1987) (emphasis supplied). Second, Section 34–8.1 of the Illinois School Code provides in pertinent part: "[Each principal] shall submit *recommendations* to the general superintendent concerning the *appointment, retention, promotion and assignment* of all educational personnel assigned ..." Ill.Rev.Stat. ch. 122, ¶ 34–8.1 (1987) (emphasis supplied).

The Board has conveniently attempted to extricate itself from liability under these statutes by belatedly claiming that the two decisions at issue were made by school officials with no "final policymaking authority." According to the Board, Silber made the "decision" to transfer Thompson, and Sosa made the "decision" to deny Thompson "selected status."

That argument, however, is disingenuous. By statute, neither Silber nor Sosa was authorized to make *final* decisions on these issues. While Silber and Sosa could make recommendations on these matters and set the necessary wheels in motion, the ability to make those recommendations *final decisions* lay only with the Board and Byrd. Phrased in the language of *Praprotnik,* by statute, Byrd, as general superintendent, retained authority to measure Silber's and Sosa's conduct for conformance with Board policy. The Board, in turn, retained authority to review Byrd's decisions.[12]

---

12. We further note that pursuant to Ill.Rev.Stat. ch. 122, ¶ 34–6 (1987), Byrd is the "chief administrative officer of the board," and "ha[s] charge and control, subject to the approval of the Board, of all departments and the employees therein of public schools, except the law department."

In this case, we expressly find that the Board and Byrd exercised their statutory authority and actively participated in both the decision to transfer Thompson and the decision to deny her "selected status." They affirmatively approved and ratified the actions initially taken by Silber and Sosa, respectively. Despite the defendants' attempts to persuade us to the contrary, the credible evidence of record reveals that neither the Board's role nor Byrd's role could be characterized as passive, nor could the conduct of either of them fairly be described as a "mere failure to take corrective action." *Cf. Cygnar v. City of Chicago,* 865 F.2d 827, 847 No. 87–1181, slip op. at 37 (7th Cir.1989) (discussing other cases). Thus, our decision to confer liability on the Board and Byrd, in his official capacity, is not, as the defendants suggest, based on the doctrine of *respondeat superior* rejected in *Monell* and again in *Praprotnik.* Instead, it is based on *Praprotnik's* holding that a municipality is chargeable under Section 1983 when its authorized policymakers reserve power to approve acts of subordinates and to then ratify those acts in order to make them final.[13] Were we to hold otherwise in this case, any municipality could insulate itself from liability for acts which it officially sanctioned by cleverly "passing the buck" down low enough in the chain of command. In such instances, to condition recovery under Section 1983 on the whim of an entangled bureaucracy would contravene the spirit and purpose of the civil rights laws.

## IV. QUALIFIED IMMUNITY OF BYRD AND SILBER

■ Thompson has sued both Byrd and Silber in their individual capacities. They, however, claim that they are immune from liability for damages under the doctrine of qualified "good faith" immunity set forth in *Harlow v. Fitzgerald,* 457 U.S. 800, 102

S.Ct. 2727, 73 L.Ed.2d 396 (1982).[14] Under the doctrine of qualified immunity, government officials performing discretionary functions are generally shielded from liability for civil damages under Section 1983 as long as their conduct did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. Under *Harlow,* whether officials are entitled to qualified immunity turns on "the objective reasonableness" of their actions. *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. Phrased otherwise, officials may enjoy immunity from personal damages if their "actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987).

Our review of the applicable case law reveals that courts interpreting the qualified immunity doctrine usually accord government officials the benefit of the doubt. *See, e.g., Malley v. Briggs,* 475 U.S. 335, 345, 106 S.Ct. 1092, 1098, 89 L.Ed.2d 271 (1986) ("As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law.") This especially holds true in cases where a balancing of competing interests comes into play. *See Rakovich v. Wade,* 850 F.2d 1180, 1213 (7th Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988); *Benson v. Allphin,* 786 F.2d 268, 276 (7th Cir.), *cert. denied,* 479 U.S. 848, 107 S.Ct. 172, 93 L.Ed.2d 109 (1986).

In *Benson,* the Seventh Circuit highlighted the distinction between the "clearly established law" standard of *Harlow* and its factual application in a balancing setting, noting:

> [I]t would appear that there is one type of constitutional rule, namely that involv-

---

13. We realize that Thompson has also sued Silber in his official capacity. The Illinois School Code, however, does not vest Silber with "final policymaking authority." The net effect is the same, though, because we have concluded that Byrd, not Silber, had "final policymaking authority" over the decision to transfer Thompson.

14. We remind the defendants that the qualified immunity issue is most appropriately raised *before* trial by filing a motion for summary judgment. *See Cygnar v. City of Chicago,* 865 F.2d 827, 842 n. 16 (7th Cir. Jan. 4, 1989).

ing the balancing of competing interests, for which the standard may be clearly established, but its application is so fact dependent that the 'law' can *rarely* be considered 'clearly established'.... With *Harlow's* elimination of the inquiry into the actual motivations of the official, ... qualified immunity typically casts a wide net to protect government officials from damage liability whenever balancing is required.

*Benson,* 786 F.2d at 276 (emphasis supplied) (footnote omitted).

In *Rakovich,* the Seventh Circuit elaborated on its observations in *Benson,* as well as the Supreme Court's observations in *Malley,* stating:

It cannot be said that an imperfect balancing resulting, on [sic] hindsight, in a decision on the wrong side of the scales shows plain incompetence or total disregard, unless, of course, the proper balance was clearly illuminated by the light of the existing law.

*Rakovich,* 850 F.2d at 1213.

Although, as outlined in our previous discussion, this Court does not agree that the defendants struck the correct balance between the competing interests at stake in this case, we cannot say that the case law existing at the time the events in question transpired illuminated the proper balance so clearly as to defeat the individual defendants' claims to qualified immunity. For example, the defendants rely on cases like *Jungels v. Pierce,* 825 F.2d 1127 (7th Cir. 1987), and *Raposa v. Meade School Dist.,* 790 F.2d 1349 (8th Cir.1986), to support their argument that hostile community sentiments resulting in "disruption" justified their decisions to transfer Thompson and to deny her "selected status." While we are not persuaded by the defendants' argu-

ments under the authority of these cases, the defendants reasonably could have thought that they struck the correct balance based on a good faith extension of the principles articulated in these cases. Thus, we believe that Byrd and Silber are entitled to qualified immunity.[15]

## V. DAMAGES

Having determined that the Board and Byrd, in his official capacity only, are liable to Thompson under Section 1983, we must address Thompson's claims for compensatory and punitive damages.

### A. *Compensatory Damages*

■ In *Memphis Community School Dist. v. Stachura,* 477 U.S. 299, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986), the Supreme Court expressly rejected the notion that Section 1983 authorizes an award of compensatory damages based on the fact-finder's assessment of the value or importance of the substantive constitutional right which has been violated. *Stachura,* 477 U.S. at 308–12, 106 S.Ct. at 2544–45. Instead, the Court defined the scope of compensatory damages under Section 1983 as "not only out-of-pocket loss and other monetary harms, but also such injuries as 'impairment of reputation ..., personal humiliation, and mental anguish and suffering." *Stachura,* 477 U.S. at 306, 106 S.Ct. at 2543.

In this case, although Thompson claims no out-of-pocket or monetary losses, she requests damages for emotional distress, humiliation, and injury to her reputation. Through her own testimony and the testimony of Anne Markey, her immediate supervisor, Thompson adequately established that she sustained compensable injuries as a direct and proximate result of the defen-

---

15. In arriving at this conclusion, we are not unmindful of the Seventh Circuit's recent decision in *Conner v. Reinhard,* 847 F.2d 384 (7th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 147, 102 L.Ed.2d 118 (1988). In *Conner,* a Section 1983 action, the Seventh Circuit reversed the district court's order granting a motion for summary judgment in favor of the individual defendants based on qualified immunity. In doing so, the Seventh Circuit concluded that a public employee's First Amendment right to speak out

on matters of public concern without fear of retaliation was clearly established *"in light of the case law existing in 1982." Conner,* 847 F.2d at 393 (emphasis supplied). We note that *Jungels, Raposa,* and some of the other cases relied on by defendants in this case were decided after 1982. Based on our analysis, these later cases have muddied the waters enough to grant Byrd and Silber qualified immunity under the very specific facts of this case.

dants' actions.[16] First, Thompson related the symptoms of anxiety, withdrawal, isolation, fear, depression, and insomnia felt by her. These symptoms all appeared after she began to hear rumors of her impending transfer. Next, Thompson described the marked change in personality which she underwent following the publication of the *Reader* article. Prior to the publication of the *Reader* article, she was outgoing, exuberant, and gregarious; after the publication of the article, she became reticent, depressed, and antisocial. During this same period of time, Thompson also experienced a change in her appetite, causing her to gain approximately twenty pounds. Markey's testimony corroborated Thompson's testimony regarding these changes in her personality and in her physical appearance. As a result of these changes, Thompson testified that she sought therapy. Her therapist prescribed medication to enable her to sleep. Thompson took this medication every night for five months between June and October of 1988. Pharmacy records corroborate this testimony.

Finally, Thompson testified to the stigma associated with an involuntary transfer. Her many years of experience with the Board had taught her that involuntary transfers were not just unusual, they were punitive; the Board reserved them for teachers who engaged in bizarre behavior. She cited examples, all of which proved her point.

The defendants introduced no evidence to controvert or impeach the testimony of Thompson and Markey. Instead, they attempted to discredit Thompson's claim for compensatory damages by offering two arguments so equally frivolous that they merit no extended discussion. First, the defendants contended that because Thompson never was "physically transferred" to Carl Schurz High School, the crucial causal link between their conduct and her injuries is missing. This argument, however, collapses under its own weight.[17]

Second, the defendants argued that this Court's issuance of a temporary restraining order acted as an "intervening factor," cutting off all of Thompson's damages. According to the defendants, this novel legal principle, together with the defendants' unsubstantiated assertion that all of Thompson's injuries occurred after the issuance of the temporary restraining order, should persuade us to deny Thompson compensatory damages. Were we to endorse such a novel legal principle, however, any litigant who successfully secured a temporary restraining order to prevent ongoing wrongful conduct would indeed be faced with a Hobson's choice: to either forego the temporary restraining order and later collect damages, or to secure the temporary restraining order and forego collecting damages. We reject such a theory.

We recognize that Thompson neither lost her job altogether nor lost income as a result of the transfer or the denial of "selected status." Nonetheless, we believe that Thompson is entitled to compensatory damages for the emotional distress, humiliation, and injury to reputation she sustained at the hands of the Board and Byrd, in his official capacity. Consequently, we award Thompson $15,000.00 against the Board and $15,000.00 against Byrd, in his official capacity only. This award is consistent with awards given in other cases involving unconstitutional transfers or unconstitutionally adverse employment action

---

**16.** We reject the defendants' contention that the testimony regarding damages in this case is comparable to that in *Nekolny v. Painter*, 653 F.2d 1164 (7th Cir.1981). Here, although it was "essentially subjective," Thompson's testimony regarding her injuries was corroborated by Markey's testimony and by pharmacy records. That is sufficient. *See Carey v. Piphus*, 435 U.S. 247, 264 n. 20, 98 S.Ct. 1042, 1052 n. 20, 55 L.Ed.2d 252 (1978).

**17.** The defendants obviously labored under the misconception that the "corrected" personnel action notice sent to Thompson after the issuance of the temporary restraining order somehow nullified the wrongful acts committed by them before the issuance of the temporary restraining order. The absurdity of this argument is highlighted by Principe's admission that but for the issuance of the temporary restraining order, the Board would have expected Thompson to report to Carl Schurz High School on September 5, 1988.

short of discharge. *See, e.g., Cygnar v. City of Chicago,* 865 F.2d 827, 848 (7th Cir.1989) (reviewing other cases).[18]

### B. *Punitive Damages*

■■■ Turning to Thompson's claim for punitive damages, we note that the Board enjoys immunity from punitive damages as a matter of law. *See City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271, 101 S.Ct. 2748, 2762, 69 L.Ed.2d 616 (1981). To the extent that Thompson had sued Byrd and Silber in their official capacities, they share the Board's immunity. *See Conner v. Reinhard,* 847 F.2d 384, 394 (7th Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 147, 102 L.Ed.2d 118 (1988).

■■■ Thompson, of course, has also sued Byrd and Silber in their individual capacities. For the reasons already outlined, however, we have concluded that Byrd and Silber, in their individual capacities, are entitled to qualified immunity. That being so, qualified immunity protects them from *both* compensatory and punitive damages. Accordingly, no punitive damages are awarded in this case.

## VI. FINDINGS OF FACT

1. Thompson is a teacher and librarian at Clemente, a public high school operated by the Board.

2. Thompson has been employed by the Board as a librarian at Clemente since 1974, the school's first year of operation.

3. Thompson holds a Bachelor's Degree in History from Roosevelt University, a Master's Degree in Library Science from Rosary College, and a Master's Degree in Guidance and Counseling from Northeastern Illinois University.

4. During her thirteen years at Clemente, Thompson has consistently received a "superior" rating, the highest rating available, on her employment evaluations.

5. Thompson has never been the subject of any administrative disciplinary proceeding.

6. The Board is a body politic and corporate charged by statute with operating the public schools of the City of Chicago.

7. Byrd is the General Superintendent of the Chicago public schools. In that capacity, Byrd makes the final decisions regarding personnel matters in all of the schools operated by the Board, subject to Board approval. Byrd's actions constitute the official practices and policies of the Board.

8. Silber is the Superintendent of District 31, an administrative division of the Board. Clemente is located within the boundaries of District 31. As Superintendent of District 31, Silber has authority over personnel decisions within the district, subject to Byrd's approval.

9. In October, 1987, in the wake of a Chicago teachers' strike, Elizabeth Blanchard, a journalist, contacted Thompson and two of her fellow teachers. Blanchard requested an interview with the three teachers in order to obtain their perspective on teaching conditions and the quality of education in an inner-city high school.

10. Before Blanchard had ever contacted Thompson and her two fellow teachers for an interview, the Board had distributed a *Media Handbook for Principals,* which instructed its school principals as follows: "You cannot forbid a teacher or any staff member to speak to a reporter as long as the interview takes place during a period when the teacher or staff member is not on duty." That statement reflects current Board policy.

11. Thompson and her two fellow teachers consented to an interview and met with Blanchard on two subsequent occasions. The first interview occurred at Blanchard's home in Evanston. The second interview occurred approximately three weeks later, after school had adjourned for the day, in Clemente's library.

12. Edited portions of the teachers' interviews appeared in the January 22, 1988 issue of the *Reader,* a weekly Chicago

---

**18.** Under *Cygnar,* we have no authority to grant the damages Thompson has requested. *See Cyg-* *nar,* 865 F.2d 827, 848.

newspaper, under the caption "What's It Like To Teach In An Inner-City High School? Listen In: Three Teachers Talking" ("the *Reader* article").

13. The *Reader* article summarized the comments of the teachers, including Thompson, on a variety of topics related to the general conditions in the Chicago public schools and the conditions at one particular high school in a largely Hispanic area. The topics covered in the *Reader* article included teacher "burnout," lack of administrative and Board support, teen pregnancy, AIDS, gangs, high drop-out rates, low reading levels, lack of parental support and involvement, shortcomings of the bilingual program, incest, drugs, student attitudes, and other social problems perceived within the community. The article also briefly mentioned a few of the "success stories" and some of the positive aspects of teaching.

14. When it was published, the *Reader* article did not identify any of the three teachers by name, nor did it identify Clemente as the high school at which they taught. Instead, the *Reader* article described the positions held by each of the three teachers and assigned each of them a pseudonym. Thompson's pseudonym was "Meg," who was described as a 50–year old librarian.

15. Despite the use of this pseudonym, shortly after publication and distribution of the *Reader* article, certain individuals either affiliated with Clemente or residing in the surrounding community surmised that Thompson was "Meg" and that the high school described in the article was Clemente.

16. As circulation of the article increased, certain comments made by the three teachers in the *Reader* article aroused the wrath of a small, but very vocal, band of individuals within the community. This small band of individuals expressed their outrage over certain comments in the article which they perceived to be insulting and offensive to the Hispanic community. Nevertheless, other members of the Clemente faculty and the Clemente community expressed their unequivocal support for Thompson.

17. During the next two months, in March and April of 1988, at least two faculty meetings and three community meetings were held, at which the contents of the *Reader* article were discussed.

18. During the two faculty meetings, those teachers present expressed divergent views about the *Reader* article. Some teachers expressed support for Thompson and her fellow teachers; others did not.

19. Those who did not consisted primarily of a handful of teachers assigned to the Clemente bilingual education program, which had been the subject of some critical remarks in the *Reader* article. These faculty members, who dubbed themselves the "Ad Hoc Committee for Concerned Teachers at Clemente," circulated copies of the article within the Clemente community and recruited community members to attend the meetings and to launch a campaign to demand removal of the three teachers.

20. All three of the community meetings were led by Mirta Ramirez, the vice-president and acting president of the Clemente local school improvement council, an advisory body. Ramirez was one of Thompson's most outspoken critics.

21. During the first two community meetings, which were previously scheduled budget hearings, the same core group of bilingual teachers, along with Ramirez, demanded the removal of Thompson and her fellow teachers. Although Silber listened to their demands, he did not promise to take any action to remove the three teachers during either of these two meetings.

22. During the time which elapsed between the second and third community meetings, Silber and two other administrators met individually with each of the three teachers.

23. On April 18, 1988, without any advance notice to Thompson, Silber summoned her to a meeting. Aside from Silber and Thompson, Arthur Tarvardian, Silber's assistant, and Jesus Sosa, Clemente's principal, were present.

24. During this April 18, 1988 meeting, Silber made several remarks to Thompson regarding her participation in the *Reader* article. First, Silber told Thompson that if he were a private employer, he could fire her. Then, Silber stated that he had the power to transfer Thompson to another school. Finally, Silber asked Thompson what she thought he should do about the situation and Thompson facetiously responded that he should give her a raise.

25. Several days later, on April 21, 1988, Silber, Tarvardian, and Sosa attended the third community meeting, which was held at the Trina Davila Center within the Clemente community. Ramirez had invited Silber to attend the meeting, threatening to hold a press conference in the event that he failed to attend.

26. Ramirez acted as the moderator of the April 21, 1988 meeting and purported to act as the "spokesperson" for various community members who desired the removal of the three teachers.

27. Angel Quinones, one of the members of the "Ad Hoc Committee of Concerned Clemente Teachers," served as the translator at the meeting. He "summarized" in Spanish the contents of the *Reader* article for those Spanish-speaking individuals who had not read it.

28. The majority of those present at the meeting again demanded the immediate removal of the three teachers. Neither Silber nor Sosa had any idea who had been invited to this meeting, who had been excluded from it, or whether the views of those in attendance were "representative" of the entire community.

29. In response, Silber advised the group that it was not within his jurisdiction to fire the teachers. Silber further stated that although he had the power to transfer the three teachers, he refused to do so in late April because he did not want to disrupt the remainder of the school year.

30. Silber did, however, promise the group that he would remove Thompson and the other two teachers from Clemente prior to the opening of the 1988–89 school year. Silber made this promise in exchange for the group's promise to refrain from picketing or boycotting and to allow the school year to end peacefully.

31. Silber made this promise without consulting Thompson, Thompson's superior, Ann Markey, other faculty members at Clemente, or any other members of the Clemente community.

32. Silber made this promise notwithstanding the fact that a significant number of members both on the Clemente faculty and in the Clemente community supported Thompson.

33. Silber did not inform Thompson of his decision to transfer her until June 14, 1988. On that date, Silber, Tarvardian, Thompson, her two fellow teachers, and Victor Gonzalez, the union field representative, met in Silber's office. Silber then advised Thompson that he intended to transfer her to Carl Schurz High School before the opening of the next academic year because he thought she had lost her effectiveness at Clemente. Unlike her two fellow teachers, Thompson was offered only one "choice": to transfer to Carl Schurz High School.

34. After being briefed on the situation, Byrd and the Board subsequently ratified Silber's decision to transfer Thompson.

35. As a result, within the following month, Thompson received a formal personnel action notice dated August 10, 1988. That notice indicated that Thompson had been transferred to Carl Schurz High School, effective September 5, 1988.

36. Defendants transferred Thompson to penalize her for the remarks she made in the *Reader* article.

37. On September 21, 1988, several weeks after this Court intervened and issued a temporary restraining order, the Board issued another personnel action notice to Thompson. This notice directed Thompson to disregard the previous staffing notice of August 10, 1988 because it "was sent in error."

38. During the period of time between the publication of the *Reader* article and the issuance of the temporary restraining order, no actual disruption occurred at

Clemente. No student or faculty member had ever refused to use the library as a result of Thompson's continued presence and Thompson continued to discharge her duties as efficiently as she always had.

39. Even after publication of the *Reader* article, Sosa rated Thompson "superior." He admitted that he only gave a "superior" rating to those who deserved it.

40. Pursuant to the terms of a consent decree entered into between the Board and the Justice Department to foster system-wide desegregation, the Board has designated certain schools, including Clemente, as "academy" high schools.

41. When a school is designated as an "academy," all teachers at the school (except assistant principals and counselors) receive an "interim" or temporary appointment.

42. "Interim status," as contrasted with "selected status," provides a teacher with less protection from removal, replacement, or transfer from a particular school.

43. A teacher remains on "interim status" unless he or she is "selected" to the staff by the principal of the academy.

44. The decision to "select" staff initially rests with the principal of the academy. A principal, however, may only recommend a candidate for "selection"; Byrd has the final authority over decisions to terminate "interim" appointments, subject to Board approval.

45. In the event a principal decides to "select" staff for a particular position, he must advertise the position in the Chicago Public Schools Personnel Bulletin.

46. Under Section 42–4 of the collective bargaining agreement between the Board and the Chicago Teachers Union, "selection" must be "on the basis of specific, articulated criteria which are published, and which relate to the requirements of the position, the academic and professional background and the other relevant experience of the applicants which relate to the requirements of the position." These specific criteria are commonly referred to as "preferences."

47. On April 18, 1988, approximately three months after publication of the *Reader* article, Sosa advertised that he would be "selecting" staff for all three librarian positions at Clemente.

48. The advertisement indicated that preference would be given to those applicants who had a Master's Degree, training or experience in individualized instruction, individual and group-diagnostic evaluation and computer-assisted instruction, and a bilingual endorsement in Spanish.

49. In addition, the terms of the collective bargaining agreement required Sosa to accord preference to incumbents when choosing between two equally qualified candidates.

50. Thompson applied for one of the three "selected" positions, as did others.

51. After receiving the applications, Sosa decided to interview six candidates. The candidates included all three of Clemente's incumbent librarians: Anne Markey, the head librarian, John Yonkoff, an assistant librarian, and Thompson. The remaining three candidates held librarian positions at other Chicago public schools.

52. Sosa conducted interviews in May and June of 1988.

53. For each incumbent candidate, the interview panel consisted of Sosa, one of his four assistant principals (on a rotating basis), and Ramirez, if she chose to participate. For each of the outside candidates, the composition of the panel remained unchanged, except for the addition of Markey, the head librarian.

54. At the conclusion of each interview, each interviewer typically evaluated the candidate using an "Interview Record Sheet," which specified twelve different criteria on which the candidate would be judged. If completed in its entirety, for each criterion, the candidate received a numerical rating on a scale from 1 (the highest) to 5 (the lowest). Each interviewer then added the numerical ratings given and computed a composite score.

55. Thompson interviewed for the "selected" position on May 18, 1988.

56. Her interview panel consisted of Sosa, Marge Ackerman, one of Sosa's assistant principals, and Ramirez, one of Thompson's most outspoken critics.

57. Thompson's interview lasted less than five minutes.

58. At the conclusion of Thompson's interview, Sosa and Ackerman evaluated Thompson by completing their respective "Interview Record Sheets." Ramirez, however, failed to complete her "Interview Record Sheet," merely writing at the bottom "no comment." In addition, though Ramirez customarily made oral comments after each interview, she declined to do so after Thompson's interview.

59. Prior to this interview, Thompson's personnel record was unblemished.

60. By the time Thompson's interview was held, Silber had already promised Ramirez and other vocal opponents of Thompson that he would transfer Thompson from Clemente prior to the opening of the next school year. Sosa had concurred in Silber's decision.

61. Of the six candidates interviewed by Sosa, only Markey and Thompson had received a "superior" rating on their most recent employment evaluations.

62. Markey and Thompson had similar library training and experience, though Thompson held two Master's Degrees (as compared to Markey's one) and Thompson's computer skills surpassed Markey's computer skills.

63. None of the six candidates, including Markey, had a bilingual endorsement in Spanish.

64. Although Markey received "selected status," Thompson did not.

65. In a memorandum dated June 23, 1988, Sosa formally notified Thompson of his recommendation to retain her on "interim status" at Clemente.

66. Thompson was denied "selected status" in retaliation for the remarks she made in the *Reader*. Sosa admitted that he was adversely influenced by Thompson's participation in the *Reader* article.

67. Byrd and the Board subsequently ratified Sosa's recommendation to deny Thompson "selected status."

68. During the course of this trial, this Court has had the unique opportunity to observe the demeanor of the witnesses while testifying to the events giving rise to this dispute. Based on our observations, we make the following credibility determinations:

(a) Plaintiff, Kay Thompson, is an assistant librarian at Clemente. Thompson's testimony on all disputed issues of fact was knowledgeable, forthright, precise, detailed, clear, and entirely credible;

(b) Martin Montes, called to testify by Thompson in her case-in-chief, is a former Clemente student and graduate who has resided in the Clemente community. He is acquainted with Thompson only through his dealings with her on a student/librarian basis while at Clemente. Though limited in scope, Montes' testimony on all disputed issues of fact was impartial, knowledgeable, candid, clear, and entirely credible;

(c) Anne Markey, called to testify by Thompson in her case-in-chief, by the defendants in their own case, and again by Thompson in her rebuttal case, is the head librarian at Clemente and Thompson's immediate supervisor. She is currently employed by the Board and has "selected status." Markey's testimony on all disputed issues of fact was unbiased, knowledgeable, forthright, precise, detailed, clear, and entirely credible;

(d) Michael Lenehan, called by Thompson to testify in her case-in-chief, is a writer and managing editor of the *Reader*. Though limited in scope, Lenehan's testimony regarding the newsworthiness and public importance of Thompson's remarks in the *Reader* article was knowledgeable, concise, very credible, and uncontroverted;

(e) Raymond Principe, called by Thompson as an adverse witness in her case-in-chief and by defendants in their own

case, is the Director of the Bureau of Teacher Personnel for the Board and is currently employed in that capacity by the Board. While Principe's testimony on the majority of the personnel procedures of the Board was knowledgeable and credible, his testimony on all other disputed issues of fact was significantly biased (in favor of defendants), equivocal, and not credible;

(f) Defendant Norman Silber is the District Superintendent of District 31. Silber's testimony on all disputed issues of fact was evasive, speculative, equivocal, inconsistent, and not credible. He often conveniently lacked recollection of details when full recollection would damage his interests and volunteered unnecessary information when full recollection served his interests;

(g) Defendant Manford Byrd, Jr. is the General Superintendent of Schools. While Byrd's testimony on his statutory duties as General Superintendent of Schools and the Board's duties and policies was knowledgeable and credible, his testimony on all other disputed issues of fact was vague, equivocal, speculative, sometimes evasive, and, to that extent, not credible;

(h) Angel Quinones, called by the defendants to testify in their own case, is an attendance officer at Clemente, who resides in Des Plaines, Illinois, outside of the Clemente community. Quinones' testimony on all disputed issues of fact, especially regarding the Clemente community's consensus on the *Reader* article, was significantly biased, embellished, often contradictory, speculative, and not credible;

(i) Jesus Sosa, called by the defendants to testify in their own case, is the principal of Clemente. Sosa's testimony on all disputed issues of fact, especially regarding the stated reasons for transferring Thompson and for denying her "selected status," was significantly biased, admittedly inconsistent, speculative, and not credible;

(j) Billy Ocasio, called by the defendants to testify in their own case, is a former Clemente student and graduate who has resided in the Clemente community. Ocasio's testimony on all disputed issues of fact was speculative, embellished, significantly biased, and substantially qualified by Ocasio himself on cross-examination. Overall, his testimony was neither knowledgeable nor credible;

(k) Miguel DeJesus, called by Thompson to testify in her rebuttal case, is a former Clemente student and graduate who has resided in the Clemente community. He is acquainted with Thompson only through his dealings with her on a student/librarian basis while at Clemente. Though limited in scope, DeJesus' testimony on all disputed issues of fact was impartial, knowledgeable, straightforward, and entirely credible;

(l) Patricia Boland, called by Thompson to testify in her rebuttal case, is an English teacher at Clemente and a union delegate. Though somewhat limited in scope, Boland's testimony on all disputed issues of fact was knowledgeable, forthright, detailed, clear, entirely credible, and uncontroverted;

(m) On all disputed issues of fact, we specifically find that Thompson's version of the events was worthy of credence and that the defendants' version of the events was unworthy of credence.

## VII.  CONCLUSIONS OF LAW

1.  This Court has jurisdiction over this cause pursuant to 28 U.S.C. §§ 1331, 1343, and 2201.

2.  Venue properly lies in this district pursuant to 28 U.S.C. § 1391(b).

■■■ 3.  In deciding whether a public employee's First Amendment rights have been abridged by her employer, a three-step analysis is required. *See Mt. Healthy Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Knapp v. Whitaker,* 757 F.2d 827, 845 (7th Cir.), *cert. denied,* 474 U.S. 803, 106 S.Ct. 36, 88 L.Ed.2d 29 (1985). The court must

determine: (1) whether, as a threshold matter, the public employee has carried her burden of showing that she engaged in constitutionally protected activity; (2) if so, whether the protected activity was a substantial or motivating factor in the employer's actions; and (3) whether the employer has defeated the public employee's claim by demonstrating that it would have taken the same action in the absence of the protected conduct. *See Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. at 576.

4. In *Pickering v. Board of Education,* 391 U.S. at 563, 88 S.Ct. at 1732, the Supreme Court established a two-pronged balancing test to be used in determining whether a public school teacher's First Amendment rights have been violated. First, the court must decide whether the teacher's speech addressed "matters of public concern." *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734. If so, then the court must "arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering* 391 U.S. at 568, 88 S.Ct. at 1734.

5. Whether an employee's speech involves "matters of public concern" must be determined by "the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers,* 461 U.S. 138, 147–48, 103 S.Ct. 1684, 1690–91, 75 L.Ed.2d 708 (1983). For purposes of making this determination, the "inappropriate or controversial character of a statement is irrelevant." *Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 2898, 97 L.Ed.2d 315 (1987).

6. Thompson's remarks in the *Reader* article addressed matters of vital public concern or interest. *See Rankin,* 483 U.S. at ——, 107 S.Ct. at 2891; *Connick v. Myers,* 461 U.S. at 147–48, 103 S.Ct. at 1690–91; *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734.

7. Although the Supreme Court has declined to formulate a precise equation for balancing the competing interests of the

public employee and the public employer, it has offered some general factors for consideration:

   (a) whether the speech impaired discipline by superiors or harmony among co-workers;

   (b) whether the speech had a detrimental impact on close working relationships for which personal loyalty and confidence are necessary;

   (c) whether the speech impeded the performance of the speaker's duties; and

   (d) whether the speech interfered with the regular operation of the enterprise;

*Rankin,* 483 U.S. at ——, 107 S.Ct. at 2899; *Pickering,* 391 U.S. at 570–73, 88 S.Ct. at 1735–37. These factors primarily focus on the "effective functioning of the public employer's enterprise." *Rankin,* 483 U.S. at ——, 107 S.Ct. at 2899.

8. After weighing the competing interests of Thompson and the defendants in this case, this Court concludes that:

   (a) Thompson's speech did not impair discipline by superiors or harmony among co-workers at Clemente;

   (b) Thompson's speech did not detrimentally affect close personal relationships for which loyalty and personal confidence were required;

   (c) Thompson's speech did not impede the performance of her duties at Clemente; and

   (d) Thompson's speech did not interfere with Clemente's regular operations.

*See Rankin,* 483 U.S. at ——, 107 S.Ct. at 2899; *Pickering,* 391 U.S. at 570–73, 88 S.Ct. at 1735–37.

9. When a public employee's speech merely "touches upon" a matter of public concern, it might not always be necessary for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action. *Connick,* 461 U.S. at 152, 103 S.Ct. at 1692. Where a public employee's speech "more substantially" involves matters of public concern, a stronger showing is required. *Connick,* 461 U.S. at 152, 103 S.Ct. at 1692. Evidence of "actual harmful effects" or

"actual disruption" is required to override a public employee's right to speak out on matters of vital public concern. *See Conner v. Reinhard,* 847 F.2d 384, 390–91 (7th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 147, 102 L.Ed.2d 118 (1988); *Zamboni v. Stamler,* 847 F.2d 73, 78 (3rd Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 245, 102 L.Ed.2d 233 (1988).

10. The defendants in this case made no showing of "actual harmful effects" or "actual disruption" at Clemente resulting from Thompson's remarks in the *Reader* article. *See Conner,* 847 F.2d at 390–91; *Zamboni,* 847 F.2d at 78.

11. The defendants in this case made no showing of "potential" or "nascent" disruption.

12. Under the two-pronged balancing test announced in *Pickering,* Thompson has carried her burden of establishing that she engaged in constitutionally protected activity under the First Amendment to the United States Constitution. *See Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734. In addition, the defendants have not made a showing that their interests in the effective functioning of Clemente in any way outweighed Thompson's interests under the First Amendment. *See Rankin,* 483 U.S. at ——, 107 S.Ct. at 2899.

13. Thompson has also carried her burden of persuading this Court by a preponderance of the evidence that her speech was a "substantial" or "motivating" factor in the defendants' decisions to transfer her and to deny her "selected status." *See Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. at 576; *Rakovich v. Wade,* 850 F.2d 1180, 1189–90 (7th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988).

14. The defendants have failed to produce any credible evidence demonstrating that they would have transferred her or denied her "selected status" had she not participated in the *Reader* article. Thus, the defendants have failed to rebut or defeat Thompson's claims as a matter of law. *See Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. at 576.

15. In deciding whether a municipality may be held liable under 42 U.S.C. § 1983 for isolated decisions made by its municipal officials or employees, the court must determine:

(1) whether the municipal official or employee has "final policymaking authority" under state law; and

(2) whether "[t]he authority to make municipal policy is necessarily the authority to make *final* policy.... [W]hen a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final."

*City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 924–26, 99 L.Ed.2d 107 (1988).

16. In this case, defendants Board and Byrd share "final policymaking authority" under the Illinois School Code for decisions regarding transfers of teachers and denial of "selected status." *See* Ill.Rev.Stat. ch. 122, ¶¶ 34–8, 34–8.1 (1987).

17. In this case, defendants Board and Byrd exercised their statutory "final policymaking authority" and actively participated in both the decision to transfer Thompson and the decision to deny her "selected status." Because the conduct of the Board and Byrd was more than a "mere failure to take corrective action," the Board and Byrd, in his official capacity, are liable to Thompson under Section 1983. *See Praprotnik,* 485 U.S. at ——, 108 S.Ct. at 924–26.

18. Under the doctrine of qualified immunity, government officials performing discretionary functions are generally shielded from liability for civil damages under Section 1983 as long as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Under *Harlow,* whether officials are entitled to quali-

fied immunity turns on "the objective reasonableness" of their actions. *Harlow,* 457 U.S. at 818. Officials may enjoy immunity from personal damages if their "actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3038, 97 L.Ed. 2d 523 (1987).

19. In those cases involving the "balancing of competing interests," the standard may be "clearly established" under *Harlow,* but its application is so fact dependent that the "law" can rarely be "clearly established." *Rakovich,* 850 F.2d at 1213; *Benson v. Allphin,* 786 F.2d 268, 276 (7th Cir.), *cert. denied,* 479 U.S. 848, 107 S.Ct. 172, 93 L.Ed.2d 109 (1986).

20. In order to defeat a claim of qualified immunity, one must show that the proper balance was "clearly illuminated" in light of the existing law. *See Rakovich,* 850 F.2d at 1213.

21. The case law existing at the time the events in this case transpired did not illuminate the proper balance so clearly as to defeat Byrd's and Silber's claims of qualified immunity. *See Harlow,* 457 U.S. at 818, 102 S.Ct. at 27; *Rakovich,* 850 F.2d at 1213; *Benson,* 786 F.2d at 276.

22. Thompson is entitled to compensatory damages for her emotional distress, humiliation, and injury to her reputation. *Memphis Community School Dist. v. Stachura,* 477 U.S. 299, 106 S.Ct. 2537, 2544–45, 91 L.Ed.2d 249 (1986); *Cygnar v. City of Chicago,* 865 F.2d 827, 848 (7th Cir. 1989).

23. Defendant Board is immune from punitive damages as a matter of law. *See City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271, 101 S.Ct. 2748, 27, 69 L.Ed.2d 616 (1981). Defendants Byrd and Silber, in their official capacities, share the Board's immunity. *See Conner,* 847 F.2d at 394.

## VIII. DECISION

For the reasons outlined in this opinion, it is the decision of this Court to enter judgment in favor of the plaintiff, Kay Thompson, and against the defendants Board of Education of the City of Chicago and Manford Byrd, Jr., in his official capacity only, and to issue the following relief:

(a) A declaratory judgment that the actions of defendants Board and Byrd in transferring Thompson and in denying her "selected status" violated the First and Fourteenth Amendments to the United States Constitution;

(b) A permanent injunction:

(1) prohibiting defendants Board and Byrd, their officers, agents, servants, employees, and all persons in active concert and participation with them from involuntarily transferring Thompson from her position as librarian at Roberto Clemente Academy High School based on the lawful exercise of her First Amendment Rights in this case;

(2) ordering defendants Board and Byrd to grant Thompson "selected status" as an assistant librarian at Roberto Clemente Academy High School;

(3) prohibiting defendants Board and Byrd, their officers, agents, servants, employees, and all persons in active concert and participation with them from taking any further retaliatory action against Thompson based on the lawful exercise of her First Amendment Rights in this case; and

(4) ordering defendants Board and Byrd, their officers, agents, servants, employees, and all persons in active concert and participation with them to remove and expunge from the defendants' personnel files on Thompson, or from any other files maintained by defendants which may be used in evaluating Thompson's present and future employment with the Board, all memoranda and other materials whatsoever which are critical of Thompson's lawful exercise of her First Amendment rights in this case;

(c) Award Thompson $15,000.00 in compensatory damages against defendant Board and $15,000.00 against defendant Byrd, in his official capacity only.

(d) Pursuant to 42 U.S.C. § 1988, award Thompson reasonable attorneys' fees, costs, and expenses. Thompson is ordered to file a verified and itemized petition for attorneys' fees, costs, and expenses on or before April 3, 1989.